# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Kibayasi**, 2013 IL App (1st) 112291

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. IBRAHIM KIBAYASI, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-2291 |
| Filed | November 6, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder of his infant son and sentence to 35 years in prison based on an incident in which he shook the child in a fit of anger were upheld over his contentions that he did not know the shaking created a strong possibility of death or great bodily harm and that the trial court improperly considered the child's death as an aggravating factor, since the evidence supported an inference of knowledge of a strong probability of death or great bodily harm and the record showed the court did not focus on the child's death in imposing a sentence but, rather, the court's attention was on the manner and circumstances of the death. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-17820; the Hon. Hyman I. Reibman, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Daniel D. Hinich, of Homewood, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Matthew Connors and Iris Ferosie, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion. <br> Justices Neville and Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant, Ibrahim Kibayasi, was found guilty of the first degree murder of his infant son and sentenced to 35 years in prison. Kibayasi shook the crying baby in a fit of anger, inflicting injuries consistent with shaken baby syndrome as the cause of death. Kibayasi appeals, arguing that the trial court erred by convicting him of first degree murder because the evidence only supports the mental state of the lesser offense of involuntary manslaughter where he was not consciously aware that his actions would create the strong possibility of death or great bodily harm. We disagree and affirm. Here, we may infer from the circumstances surrounding the incident, defendant's conduct, and the nature and severity of the victim's injuries that defendant acted knowing of a strong probability of death or great bodily harm.

¶ 2 BACKGROUND

¶ 3 In 2002, Kibayasi, a native of Tanzania, came to the United States at age 22 on a student visa. Kibayasi attended college in Atlanta, Georgia, receiving an associate's degree in accounting in 2004. He subsequently moved to Chicago and worked as a phone technician and then a transportation analyst. In 2007, Kibayasi began dating Martha Lupembe. After Lupembe became pregnant in 2008, Kibayasi moved into an apartment with her. Kibayasi and Lupembe's son Dylan was born on March 26, 2009.

¶ 4 On September 3, 2009, Kibayasi was home caring for the then-five-month-old while Lupembe was at work. Kibayasi became frustrated with Dylan's crying. He shook him with enough force to cause Dylan to become unconscious. Kibayasi performed CPR on Dylan and then placed the infant in the car to take him to the hospital. Dylan began crying, which Kibayasi took as a good sign. As a result, Kibayasi decided to pick Lupembe up from work instead. While sitting in the back seat of the car with Dylan, Lupembe saw that Dylan was having a seizure, and she called 911. The dispatcher instructed them to pull the car over and wait for an ambulance. Kibayasi stopped at a gas station. Emergency vehicles soon arrived

and took Dylan to the hospital. He was diagnosed with extensive retinal hemorrhages in the back of his eyes and subdural hematomas on both sides of his brain. Dylan's treating physician testified that his injuries were likely caused by nonaccidental trauma, otherwise known as shaken baby syndrome. Dylan's condition deteriorated and he died on September 9, 2009.

¶ 5    Kibayasi did not tell Lupembe or the doctors at the hospital that he shook Dylan. Later, Kibayasi provided a videotaped statement to police and an assistant State's Attorney in which Kibayasi explained that after Dylan refused to eat and kept crying, Kibayasi started shaking him, saying "Why you crying?" and "What you want?"

¶ 6    The matter proceeded to a bench trial. The State introduced Kibayasi's statement as evidence and presented Lupembe's videotaped deposition, testimony from the responding paramedics, Dylan's treating physician, the doctor who performed Dylan's autopsy, and an expert in pediatric emergency medicine regarding shaken baby syndrome. Kibayasi testified on his own behalf.

¶ 7    Kibayasi was found guilty of first degree murder and acquitted of aggravated battery to a child. The trial court denied Kibayasi's motion asking for a judgment of acquittal or a new trial. After a hearing, Kibayasi was sentenced to 35 years in prison.

¶ 8                                  Evidence at Trial

¶ 9    At trial, Prospect Heights fire department paramedic Ryan Petty testified that on September 3, 2009, at about 5 p.m., he responded to a gas station at Palatine and Wolf Roads, in Prospect Heights. On arriving, he was directed to a car, where he found Dylan unresponsive but breathing. Petty testified that Dylan was not crying or cooing, his body was rigid, and his eyes were rolled into the back of his head. Dylan's mother stood nearby and cried as the paramedics treated Dylan. Petty drove the ambulance that took Dylan to the hospital.

¶ 10   A Village of Prospect Heights fire fighter, Lieutenant Jeff Szczech, testified that on September 3, 2009, he responded to a gas station at Palatine and Wolf Roads in an advanced life-support engine. Once there, Szczech was directed to a baby in the backseat of a car. He saw a man and woman and assumed that the woman was the baby's mother because she was "frantic" about getting her son treatment. He observed that the mother stood nearby while the baby was treated and the father stood away and had a quiet demeanor.

¶ 11   After stipulations were entered regarding the videotaped deposition of Lupembe, the State entered it into evidence and published the deposition to the court. In her deposition, Lupembe testified that she was born in Tanzania and came to the United States when she was 17 years old on a student visa. She studied biology at Northern Kentucky University, and after two years, moved to Illinois and attended Truman College and Roosevelt University. In 2004, Lupembe met Kibayasi. They began dating in 2007, the same year she began working as a financial analyst in Northbrook, Illinois.

¶ 12   In August 2008, Lupembe testified that she moved into an apartment with Kibayasi in Mount Prospect. On March 26, 2009, Dylan was born to them. At birth, Dylan was "jittery" and placed in the neonatal intensive care unit for 24 hours for observation. Several tests were

performed to rule out seizures. She was informed that Dylan had a premature nervous system and the "jittery" behavior would wear off. By Dylan's one month check-up, all of the "jitters" were gone. At the time of his death, five-month-old Dylan was a happy child, according to Lupembe, and could roll over 360 degrees, was playful, and "liked jumping." Dylan's development was normal and "very active."

¶ 13    Lupembe testified that Kibayasi was primarily responsible for caring for Dylan while she was at work. On days when Kibayasi had something to do or a job interview, Dylan would go to day care. On Friday, August 27, 2009, Dylan was at day care because Kibayasi had a job interview. When Lupembe picked him up, Dylan appeared to be normal. On Saturday, August 28, 2009, Dylan went to Lupembe's cousins' house and stayed there overnight. The next day, Lupembe's cousin dropped him off at home and Dylan appeared normal. On Monday, August 31, 2009, Lupembe noticed that Dylan had a "bit of a cold" and she sat with him in a steamy bathroom to help clear out his congestion. That evening, Dylan vomited and had loose stool. On Wednesday, September 2, 2009, Dylan's symptoms continued and Lupembe called Dylan's doctor and spoke with a nurse. Dylan's doctor called Lupembe and explained that the vomiting "wasn't consistent with anything" and the loose stool was to be expected after changing Dylan's baby formula. The doctor advised Lupembe to "just keep an eye on the baby."

¶ 14    On Thursday, September 3, 2009, Lupembe woke up at 6 a.m., fed Dylan a bottle of baby formula and was driven to work by Kibayasi around 7:30 a.m. Lupembe sat in the back of the car with Dylan, who acted happy and alert and was looking around at things. Lupembe told Kibayasi that Dylan might sleep a lot that day because he had not slept well the night before.

¶ 15    At 4 p.m., Lupembe received a text message from Kibayasi stating that he would be late picking her up from work. A short time later, Kibayasi called Lupembe and explained that he was initially going to be late picking her up because he planned on driving Dylan to the hospital because Dylan had been vomiting and appeared weak. Kibayasi then told Lupembe that Dylan seemed alert again, so Kibayasi decided to go get her instead.

¶ 16    At around 5 p.m., Kibayasi arrived. When Lupembe saw Dylan, she immediately believed something was wrong with him. Dylan's eyes were blank and he was unresponsive. Lupembe listened to Dylan's breathing because his chin was down and his breathing was hard and labored. As Lupembe called 911 from her cell phone, she saw Dylan seizing. Dylan's eyes went blank and his body stiffened up. Lupembe yelled to defendant to "drive, drive, drive" because she thought it would be faster to drive to the hospital than wait for an ambulance. Lupembe testified that the 911 dispatcher instructed them to pull over so that the ambulance could find them. They stopped at a gas station right across from the Wheeling fire department.

¶ 17    Lupembe testified that while she was in the car with Kibayasi, she asked him if anything had happened that day. Kibayasi responded, "No." Lupembe also asked Kibayasi if Dylan was seizing on the way to pick her up. Kibayasi replied, "No. It started now."

¶ 18    At the hospital, Lupembe spoke with the doctor and tests were performed on Dylan. The doctor informed Lupembe that a scan revealed that Dylan had blood in his brain. The doctor

asked Lupembe if Dylan had fallen, been shaken, or had any traumatic incident happen to him. Lupembe responded, "No." Then Lupembe asked Kibayasi if Dylan fell and Kibayasi said, "No." Lupembe testified that she did not ask Kibayasi if he shook Dylan because she did not think that would ever happen and believed Kibayasi to be a good father. Lupembe testified that the symptoms that Dylan exhibited on September 3 were different from the "jittery" symptoms he had at birth and he had never previously had these symptoms.

¶ 19    Lupembe testified that on September 4 the Department of Children and Family Services asked her and Kibayasi to leave the hospital due to concerns for Dylan's safety since they were the last people to be with Dylan before his injuries. Lupembe testified that she would be flying home to Tanzania on October 26, 2009, and that she wanted to be with her mother.

¶ 20    Next, the State entered Kibayasi's videotaped statement to an assistant State's Attorney into evidence, without objection. In the statement, Kibayasi acknowledged that he had been advised of his *Miranda* rights and the assistant State's Attorney again advised Kibayasi of those rights, which he waived. Kibayasi stated that on September 3, Dylan was five months old and lived with himself and Lupembe in Mount Prospect. He was unemployed and took care of Dylan during the day while Lupembe was at work. Lupembe took over caring for Dylan at 4 p.m. until Dylan's bedtime at 8 or 9 p.m. Kibayasi stated that the week before Dylan's injuries, his son was sick with a cold and diarrhea. Despite being sick, Dylan was alert, responsive, and liked to play.

¶ 21    Kibayasi stated that he had been frustrated about not being able to find a job and admitted that he had taken his frustration out on Dylan in the past. Kibayasi described an incident two or three weeks before, where Dylan was crying and refused to eat, so Kibayasi grabbed him forcefully in the ribs. Kibayasi stated that he was mad on that day because Dylan would not stop crying. Kibayasi explained that after the incident, he apologized to Dylan. Kibayasi never told anybody about that incident. Kibayasi stated that "it's hard to control my anger sometime[s]" and that he "got frustrated so easily." Kibayasi acknowledged, "I know I have my anger problem or something."

¶ 22    On September 3, Kibayasi drove Lupembe to work, and then Dylan slept for five hours. Kibayasi called several people for jobs, but was unsuccessful in his search. Kibayasi said he was angry because he regretted his decision to quit his previous job. Dylan then refused to eat and kept crying. Kibayasi said he grabbed Dylan and started shaking him. Kibayasi asked the baby, "Why you crying?" and "What you want?" Kibayasi stated that when he shook Dylan, he was "just mad." Kibayasi admitted to shaking Dylan three or four times and demonstrated how he shook Dylan by picking up a paper bag, raising the bag over his head, and shaking the bag 18 times. Kibayasi stated that he saw that Dylan's neck was not strong enough to hold his head as he was shaken and Dylan's head moved in the same direction as he was shaken. After shaking Dylan, Kibayasi placed him down and noticed Dylan was not moving. Kibayasi attempted to perform CPR. Dylan coughed, which Kibayasi took that as a good sign. Kibayasi used a newspaper to fan Dylan and saw that Dylan started breathing and opening his eyes.

¶ 23    Kibayasi did not call 911. He decided to drive Dylan to the hospital, but as he was driving, Kibayasi noticed that Dylan started "coming back" and "looking okay."

Consequently, instead of taking Dylan to the hospital, Kibayasi called Lupembe, told her he was on his way to pick her up from work, and would be late. He did not tell her what happened to Dylan.

¶ 24    After picking up Lupembe, Dylan had a seizure; his eyes rolled back into his head. When the fire department arrived, Kibayasi did not tell them he had shaken Dylan. Nor did Kibayasi tell police what happened because he was "feeling bad." Kibayasi said, "Whatever [Dylan's] injuries, I'm the only one who [knew] and I'm responsible for them. Because of my anger problem *** I wanted to hid[e] or something." Kibayasi added that he told police a couple of different stories–that he had been in a car accident with Dylan in the backseat on the Wednesday before and that Dylan had been sick.

¶ 25    Following the videotape of Kibayasi's statement, Dr. Clifford Spanierman testified that on September 3, he was the attending doctor in the pediatric emergency department at Lutheran General Hospital when Dylan was brought in by paramedics. Dr. Spanierman observed that Dylan was poorly responsive and lethargic, and his breathing was slightly irregular and shallow. He ordered a CAT scan, which revealed that Dylan had an extensive left-sided subdural hematoma and swelling in his brain. Later, Dylan stopped breathing and needed to be intubated to stay alive.

¶ 26    Dr. Spanierman also ordered a chest X-ray, which revealed that Dylan had several rib fractures in various stages of healing. Dr. Spanierman opined that several of Dylan's rib fractures were two to three weeks old. Dr. Spanierman testified that it is difficult to fracture a child's ribs and requires a significant and violent force to do so. Dr. Spanierman then testified as an expert and opined that he was "100 percent sure that [Dylan] was a victim of child abuse." He explained that the amount of force necessary to sustain the type of subdural hematoma in Dylan's case involved "a violent act of shaking back and forth" and "[c]ompletely inappropriate, violent force."

¶ 27    An expert in pediatric ophthalmology, Dr. David Mittelman, testified that on September 4, he was consulted regarding Dylan's injuries. Dr. Mittelman examined Dylan's eyes and noted that his pupils were minimally responsive. When he examined Dylan's retinas, Dr. Mittelman found extensive retinal hemorrhages in the back of Dylan's eyes and Dylan had extensive bleeding in the retinas of both eyes. Dr. Mittelman said he was aware that Dylan also had subdural hematomas.

¶ 28    Dr. Mittelman opined that Dylan's injuries were likely caused by nonaccidental trauma, otherwise known as shaken baby syndrome. Although normal, playful shaking of a baby would not cause these injuries, "It takes a very forceful, repetitive shaking to produce these injuries, lasting probably 10 to 20 seconds or so."

¶ 29    Dr. Lauren Moser, an assistant medical examiner at the Cook County medical examiner's office, testified that she performed an autopsy on Dylan. And that at the time of his death, Dylan was 5 months old, weighed 21 pounds, and was 27½ inches in length. An internal examination revealed subdural hematomas on both sides of Dylan's brain and swelling. Dr. Moser also observed uncal herniation in both parts of Dylan's brain, which occurs when the brain swells and moves into the brainstem. It affects breathing. Dr. Moser also observed hemorrhages in the retinas and fluid in both of Dylan's eyes. Dr. Moser said Dylan had three

healing fractures to his right ribs that were about 7 to 14 days old. Dr. Moser opined that it would require "significant force" to cause the rib fractures because a baby's bones are bendable.

¶ 30    Dr. Moser then testified as an expert in forensic pathology. He said Dylan's death was from blunt head trauma as a result of child abuse. Dr. Moser explained that child abuse referred to an "injury [that] was inflicted upon this child by another individual." Dr. Moser also explained that blunt head trauma referred to trauma inflicted on the head and can be caused by the brain coming in contact with the skull. Dr. Moser testified that significant shaking of a five-month-old baby was consistent with Dylan's brain injuries.

¶ 31    After the State rested its case, defense counsel made a motion for a directed finding on the first degree murder count. Defense counsel argued that the State failed to prove intent or knowledge that Kibayasi's acts would cause great bodily harm or death. The trial court denied the motion.

¶ 32    Kibayasi testified that on September 3, 2009, he was watching Dylan while Lupembe was at work. Dylan was sick with symptoms of diarrhea and vomiting. While Kibayasi was in the bathroom getting ready to leave to pick Lupembe up from work, Dylan began crying. Kibayasi testified, "I didn't want him to cry, and I just lost my mind." Kibayasi picked Dylan up and shook him saying, "Why are you crying? Why are you crying?" Kibayasi testified that "[T]hen in a quick second, like, I saw *** his eyes rolling back." Kibayasi testified that Dylan became unconscious and he attempted to perform CPR. Kibayasi noticed that Dylan opened his eyes and "start[ed] coming back." Kibayasi called Lupembe and told her that Dylan was sick, so he was driving Dylan to the hospital. Kibayasi testified that he placed Dylan in the car, began driving to the hospital, but when he rolled down the windows, Dylan began to cry, which he took as a good sign. Kibayasi testified that Dylan appeared better, so he decided not to go to the hospital, turned around, and drove to get Lupembe at work.

¶ 33    Kibayasi testified that Lupembe got into the back of the car and noticed that Dylan appeared to be having a seizure. Lupembe called 911. Kibayasi stopped the car at a gas station, a fire truck and ambulance arrived, and Dylan was transported to the hospital. At the hospital, Kibayasi did not tell anyone that he shook Dylan because he "felt so bad." Later, Kibayasi went to the police station where he provided the videotaped statement. Kibayasi testified that while he was shaking Dylan he had "lost his mind" and did not know what was happening. Kibayasi testified that he did not intend to kill or hurt Dylan, and he did not know shaking a baby could be deadly. On cross-examination, Kibayasi testified that he is 5 feet and 10 inches and 150 pounds and he knew that Dylan was delicate and he had to handle a small child with care.

¶ 34    After closing arguments, the trial court found Kibayasi guilty of first degree murder. The court determined that Kibayasi knew that his act of shaking Dylan would cause a strong probability of great bodily harm or death. The court explained that Kibayasi's knowledge and intent could be inferred from his conduct before and after shaking Dylan and the severity of Dylan's injuries. The trial court denied Kibayasi's motion for a new trial and proceeded to sentencing. The trial court was presented with the presentence investigation report, arguments by both sides, and a statement by Kibayasi.

¶ 35    Kibayasi was sentenced to 35 years in prison.

¶ 36                                    ANALYSIS
¶ 37                             Conviction for Murder
¶ 38    Kibayasi first argues that the State did not prove him guilty of first degree murder beyond a reasonable doubt. He disputes that he shook Dylan with the knowledge that he could cause death or great bodily harm.

¶ 39    At the outset, we reject Kibayasi's contention that this issue presents a question of law, subject to *de novo* review. In support of this contention, defendant relies on *People v. Smith*, 191 Ill. 2d 408 (2000). In *Smith*, our supreme court held that where the facts of the case are not in dispute, the defendant's guilt is a question of law, which should be reviewed *de novo*. Unlike the present case, the court in *Smith* was asked to construe the meaning of statutory terms as applied to the undisputed facts of that case. *Smith*, 191 Ill. 2d at 411. Here, the issue presented is whether the State proved knowledge as an element of first degree murder. This is a factual question that turns not only on the credibility of the witnesses, but also inferences to be drawn from all of the evidence. Therefore, we decline defendant's invitation to depart from our traditional method of reviewing the sufficiency of the evidence in criminal cases.

¶ 40    The proper standard of review of a challenge to the sufficiency of the evidence is well settled. A criminal conviction will not be set aside on review unless the evidence is " 'so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt.' " *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011) (quoting *People v. Collins*, 214 Ill. 2d 206, 217 (2005)). The function of this court is not to retry the defendant when considering a challenge to the sufficiency of the evidence of guilt. *People v. Beauchamp*, 241 Ill. 2d at 8. Rather, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This means that this court " 'must allow all reasonable inferences from the record in favor of the prosecution.' " *Beauchamp*, 241 Ill. 2d at 8 (quoting *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)).

¶ 41    Kibayasi argues that the trial court erred by finding him guilty of first degree murder instead of involuntary manslaughter on the basis that the evidence only supports the mental state for involuntary manslaughter. Kibayasi maintains that the evidence shows that after Dylan was crying, Kibayasi lost control of himself and shook Dylan for a brief period of time causing injury. Kibayasi argues that this evidence is inconsistent with a finding that he *knew* his actions with Dylan created a strong probability of death or great bodily harm.

¶ 42    The key difference between first degree murder and involuntary manslaughter is the mental state: acting while *knowing* of a strong probability of death or great bodily harm versus acting *recklessly*. Compare 720 ILCS 5/9-1(a)(2) (West 2008) (first degree murder), with 720 ILCS 5/9-3(a) (West 2008) (involuntary manslaughter). A defendant commits knowing first degree murder when, in performing the acts that cause the death of another, he knows that "such acts create a strong probability of death or great bodily harm to that

individual or another." 720 ILCS 5/9-1(a)(2) (West 2008). The factual determination of whether a defendant acted knowingly or with intent may be inferred from the circumstances surrounding the incident, defendant's conduct, and the nature and severity of the victim's injuries. *People v. Renteria*, 232 Ill. App. 3d 409, 416 (1992). In contrast, a defendant is guilty of involuntary manslaughter where the defendant recklessly performs an act that is likely to cause death or great bodily harm to another person. 720 ILCS 5/9-3(a) (West 2008). A defendant is deemed to have acted recklessly when he or she consciously disregards a substantial, unjustifiable risk that his or her acts are likely to result in death or great bodily harm to another person. 720 ILCS 5/4-6 (West 2008); *People v. Castillo*, 188 Ill. 2d 536, 540 (1999). While a "defendant may act recklessly where he [or she] commits deliberate acts but disregards the risks" of those acts (*People v. Di Vencenzo*, 183 Ill. 2d 239, 252 (1998)), "[a] voluntary and willful act having the natural tendency to cause death or great bodily harm is evidence of an intentional act rather than recklessness" (*People v. Ciavirelli*, 262 Ill. App. 3d 966, 973 (1994)).

¶ 43 We find the evidence sufficient to support the conclusion that Kibayasi knew his acts created a strong probability of death or great bodily harm for Dylan. Circumstantial evidence, including medical testimony regarding the severe and violent injuries to a baby victim, is sufficient to prove that the injuries were intentionally or knowingly inflicted, even where a defendant testifies that he did not intend to injure the victim. *People v. Coleman*, 311 Ill. App. 3d 467, 477 (2000); *People v. Ripley*, 291 Ill. App. 3d 565, 569 (1997); *People v. Rader*, 272 Ill. App. 3d 796, 805 (1995); *People v. Renteria*, 232 Ill. App. 3d 409, 416-17 (1992). In this case, a rational trier of fact could properly infer from the medical testimony, as to the extent and severity of Dylan's injuries, that Kibayasi knew that his actions created a strong probability of death or great bodily harm.

¶ 44 First, the record reflects that Dylan sustained substantial head and brain injuries. The injuries to Dylan included retinal hemorrhages in both of his eyes, subdural hemorrhages on both sides of his brain, and severe brain swelling which pushed on his brain stem and interfered with breathing. Dr. Mittelman diagnosed Dylan with shaken baby syndrome and concluded that only "a very forceful, repetitive shaking" of Dylan caused the retinal and subdural hemorrhaging in Dylan's eyes and brain. Dr. Spanierman testified that the amount of force necessary to sustain the type of subdural hematoma in Dylan's case involved "a violent act of shaking back and forth."

¶ 45 Next, we note that Kibayasi is nearly 6 feet tall and weighs about 155 pounds; whereas, Dylan was a 5-month-old baby and weighed 21 pounds. Kibayasi testified that it was his responsibility to care for Dylan and Kibayasi was aware that he needed to be gentle with Dylan since he was just a baby. In his videotaped statement, Kibayasi sated that he was frustrated about being unemployed and shook Dylan after Dylan refused to stop crying. Kibayasi demonstrated by picking up a paper bag, raising the bag over his head, and shaking the bag 18 times. It is not unreasonable to infer that an adult violently shaking a baby had to know that doing so carried a strong risk of death or great bodily harm.

¶ 46 Further, Kibayasi testified that immediately after shaking Dylan, he saw Dylan become unconscious and attempted to perform CPR. Kibayasi testified that he saw Dylan's neck was not strong enough to support his head while being shaken, and Dylan's eyes rolled into the

back of his head. Kibayasi later did not tell anyone, including Dylan's mother and the doctors at the hospital, that he had shaken Dylan. Kibayasi initially told the police that Dylan's injuries may have been caused by a minor car accident. In his videotaped statement, Kibayasi explained that he did not tell police what happened to Dylan because he was "feeling bad." It can be inferred that Kibayasi was aware of the severity of Dylan's injuries and that his actions were wrongful. Kibayasi also admitted that he was frustrated with his inability to find a job and had an "anger problem." A bad temper is no excuse for violence and does not reduce a mental state from knowledge to recklessness. *People v. Rodriguez*, 275 Ill. App. 3d 274, 285 (1995).

¶ 47 Kibayasi, nonetheless, argues that at the time of Dylan's injury, he lost control and did not intend to harm Dylan when he shook him for a mere second. Kibayasi notes that Dr. Mittelman testified that it would take approximately 10 to 20 seconds of shaking for Dylan to sustain his injuries. Kibayasi also cites Dr. Moser's testimony that Dylan's injuries could have occurred in "a mere number of seconds." Kibayasi relies on this testimony to support his claim that he only shook Dylan for "a quick second" and did not have time to consider the consequences of his acts with Dylan.

¶ 48 The record shows that Dr. Mittleman diagnosed Dylan with shaken baby syndrome and estimated that it would take about 10 to 20 seconds of shaking for Dylan to sustain his injuries. Kibayasi also testified that while shaking Dylan, he observed that Dylan's neck could not support his head and he saw Dylan's head moving back and forth as he was shaken. Kibayasi testified that Dylan's eyes rolled into the back of his head and he became unconscious. This contradicts Kibayasi's testimony that he shook Dylan for "a quick second" and did not consider what he was doing. It was the role of the trier of fact to determine the credibility of Kibayasi's testimony along with the medical testimony and the weight to be afforded to each of their testimony. *Coleman*, 311 Ill. App. 3d at 475.

¶ 49 Moreover, as we previously explained, the medical testimony regarding the severity of the injuries sustained by Dylan was sufficient to prove that the injuries were knowingly inflicted. Irrespective of the number of seconds that Kibayasi shook Dylan, the evidence shows that a substantial amount of force was necessary to sustain the retinal and subdural hemorrhaging in Dylan's eyes and brain. In fact, Dr. Mittelman concluded that only a "very forceful, repetitive" shaking of Dylan could have caused his injuries. Likewise, Dr. Spanierman explained that the amount of force necessary to sustain the injuries in Dylan's case involved "a violent act of shaking back and forth." The severity of the violence necessary to cause the injuries can sustain an inference of knowledge of a strong probability of death or great bodily injury. *Rader*, 272 Ill. App. 3d at 804-05.

¶ 50 The evidence, especially the uncontroverted medical testimony and Kibayasi's admissions that he shook Dylan, support the trial court's finding of knowledge of a strong probability of death or great bodily harm. The trial court did not need to find, and in fact did not find, that Kibayasi intended Dylan's death. All that was required was that Kibayasi knew that his actions risked causing death or serious bodily harm to Dylan. The evidence was sufficient in this respect. We therefore disagree that the trial court erred in finding Kibayasi guilty of first degree murder instead of involuntary manslaughter.

¶ 51                                    Sentencing

¶ 52        Kibayasi next contends that the trial court improperly considered Dylan's death as an
        aggravating factor, where death is inherent in the offense of murder. During sentencing, the
        court stated:

            "The evidence in this case, and I won't belabor all of the facts of the case, showed
            that there was proof beyond a reasonable doubt that this defendant committed first degree
            murder. The defendant, as was pointed out, has an anger management problem. That
            evidence was obvious from (A) the way the baby's death was caused and the direct result
            of the shaking that caused the death of that child. ***

                                        * * *

            The report indicates he's in good physical health, and there's no report he has any
            psychological problems other than the anger that was enacted upon Dylan. I take into
            consideration in aggravation that the results of his actions caused the death of Dylan. And
            I take into consideration that any sentence that this court would impose needs to make
            a statement to deter others from committing similar offenses. I take into consideration
            that the defendant held that position of trust as the father of the five-month-old baby. I
            take into consideration the violent nature of the death of this child. I take into
            consideration factors that I'm required to take into consideration in mitigation.

                                        * * *

            As far as whether or not there's a likelihood that an event like this could occur again,
            well, that's an unknown. Up until this time the defendant had no other record. He had
            one child. The bottom line in this case was that the defendant as a father *** [was] to
            protect and to nurture and raise a child to live a happy and a healthy normal life. The
            anger was so intense that Dylan was treated like an inanimate object, and not like a five-
            month-old baby that an adult, an educated adult, needs to handle with care and softness
            and love. At that moment in time, Mr. Kibayasi lost that ability to recognize the
            humanness of Dylan. And in addition to breaking criminal laws, he broke the law that I
            talk about, to protect and nurture and raise and love your child."

¶ 53        Kibayasi asserts that the trial court's statement that "the results of his actions caused the
        death of Dylan" indicates that the court relied on a factor inherent in the offense, namely, that
        a death occurred. The State initially asserts that Kibayasi has waived this issue by failing to
        object at the sentencing hearing and failing to include the alleged error in his written posttrial
        motion. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Kibayasi acknowledges that he
        forfeited this issue by failing to include it in his motion to reconsider the sentence but asks
        this court to consider it under the plain error doctrine.

¶ 54        Forfeited issues relating to sentencing may be reviewed for plain error. *Id.* at 545. To
        establish plain error, a defendant must show either that: "(1) the evidence at the sentencing
        hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair
        sentencing hearing." *Id.* Defendant bears the burden of persuasion under either prong of the
        plain error rule. *Id.* But, before we can determine whether defendant has met his burden
        under either prong of plain error, we must first decide whether a clear or obvious error

                                         -11-

occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 55 It is impermissible for the trial court to impose a more severe sentence on the ground that defendant caused the victim serious bodily harm, namely, death, because death is inherent in the offense. *People v. Saldivar*, 113 Ill. 2d 256, 271-72 (1986). A court may consider in aggravation the fact that "defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2008). In applying this aggravating factor, the trial court may consider the force employed and the physical manner in which the victim's death was brought about, which comprehends the degree or gravity of defendant's conduct rather than the end result, that is, the death of the victim. *Saldivar*, 113 Ill. 2d at 271-72.

¶ 56 It is unrealistic to suggest that the trial court, in sentencing defendant, must avoid mentioning that someone had died or risk committing reversible error. *People v. Benford*, 349 Ill. App. 3d 721, 735 (2004). Where the trial court expressly states that it was considering the death of the victim, the court errs. *Benford*, 349 Ill. App. 3d at 735.

¶ 57 In this case, based on a thorough review of the trial court's remarks, the court's comments described the circumstances and physical manner in which the victim's death was brought about. The trial court focused on Kibayasi's issues with his anger and violent shaking of Dylan. The court noted that Kibayasi's conduct was completely inappropriate as a father to a five-month-old baby. The court's reference to Dylan's death was an acknowledgment that a serious offense had occurred. The record does not reflect that the court considered Dylan's death as an aggravating factor. Rather, the court noted that "defendant's conduct caused *** serious harm." See 730 ILCS 5/5-5-3.2(a)(1) (West 2008).

¶ 58 The trial court's comments stand in stark contrast to those in *People v. Joe*, 207 Ill. App. 3d 1079 (1991), and *People v. Dowding*, 388 Ill. App. 3d 936 (2009), both of which Kibayasi relies on to support his argument. In *Joe*, the trial court explicitly stated that a factor in aggravation was that the defendant "engaged in a course of conduct which threatened serious harm, indeed did cause serious harm to the victim." (Internal quotation marks omitted.) *Joe*, 207 Ill. App. 3d at 1085. In *Dowding*, the trial court stated that a factor in aggravation was "that the [d]efendant's conduct caused or threatened serious harm" and "Defendant's conduct in this offense caused the greatest harm there could be, that is the death of another person." (Internal quotation marks omitted.) *Dowding*, 388 Ill. App. 3d at 941. Here, the trial court focused on the manner and circumstances of Dylan's death, rather than the death itself, as an aggravating factor. Under these circumstances, no error occurred and we decline to review Kibayasi's claim under plain error analysis.

¶ 59 Kibayasi next argues that his sentence is excessive in light of his rehabilitative potential because the trial court failed to consider the mitigating factors presented, including Kibayasi's lack of criminal history, educational accomplishments, employment record, and the remorse he expressed for the offense.

¶ 60 A trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). We will not disturb a sentence falling within the statutory limits absent an abuse of discretion. *People v. Stroup*, 397 Ill. App. 3d 271, 274 (2010). A court has abused its discretion when the record shows the sentence is excessive and not justified under any reasonable view of the record. *People*

*v. Pippen*, 324 Ill. App. 3d 649, 651-52 (2001).

¶ 61    Where mitigating evidence is before the court, it is presumed that the sentencing judge considered the evidence, absent some indication to the contrary, other than the sentence itself. *People v. Allen*, 344 Ill. App. 3d 949, 959 (2003). We will not substitute our judgment for that of the trial court merely because we would have weighed the factors presented differently. *Allen*, 344 Ill. App. 3d at 959.

¶ 62    Kibayasi fails to show that the trial court did not consider the mitigating factors before it. At sentencing, the trial court noted that "defendant's education took him through college" and "defendant has no prior record, juvenile or adult." The court stated, "I take into consideration the remorse that Mr. Kibayasi has shown in this case, not only in the video statement that he gave and the testimony in this court, but what he's indicated to this court." The trial court further stated:

   "I have considered the trial evidence and presentence investigation, the history and character and attitude of this defendant, the evidence and arguments in the defendant's statement in allocution, the arguments made by the lawyers with regard to sentencing, and I have indicated to you what I believe are the issues that the court needs to consider with regard to aggravation and mitigation."

¶ 63    The sentencing range for Kibayasi's offense was 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2008). The record indicates that defense counsel argued for a sentence of the statutory minimum and asserted the mitigating factors. In imposing sentence, the trial court cited numerous aggravating factors, including Kibayasi's position of trust and supervision as Dylan's father, the need for deterrence, and the circumstances and seriousness of the offense. The trial court also specifically stated that it considered the evidence presented in mitigation, including Kibayasi's lack of criminal history, his education, and his remorse. The fact that Kibayasi's sentence is at the lower end of the sentencing range suggests that the trial court considered the mitigating factors presented in this case. Examining the record, we find that the trial court did not abuse its discretion in sentencing Kibayasi to 35 years in prison.

¶ 64    Kibayasi next argues that the trial court improperly considered the fact that the victim was a child as an aggravating factor. But the record belies Kibayasi's contention. During sentencing, the trial court noted, "Kibayasi's anger was so intense that Dylan was treated like an inanimate object, and not like a five-month-old baby that an adult, an educated adult, needs to handle with care and softness and love." The court further stated, "[I]n addition to breaking criminal laws, he broke the law that I talk about, to protect and nurture and raise and love your child." The trial court's comments indicate that it considered Kibayasi's position of trust and supervision as Dylan's father as a factor in aggravation, rather than the fact that Dylan was a child. See 730 ILCS 5/5-5-3.2(a)(14) (West 2008).

¶ 65    Lastly, Kibayasi argues that the trial court improperly concluded that he was an "angry young man," and considered this factor in aggravation. Kibayasi contends that "there is no evidence that [he] had the inability to control his anger except for the day that he shook his son." Specifically, the trial court stated:

   "And I don't know enough about the defendant to know about his character traits, other

-13-

than to know that he had an anger management problem *on that date*. He was an angry young man, and that resulted in the death." (Emphasis added.)

¶ 66 The record shows that the court's comments were directed at Kibayasi's anger on the date of the offense. In both his videotaped statement and testimony at trial, Kibayasi admitted that he was frustrated with his inability to find employment and Dylan's continued crying. Kibayasi stated that his anger resulted in his shaking Dylan. Kibayasi admitted that he had problems with his anger and in his motion to reconsider his sentence, argued:

> "The facts of this tragic case show that Mr. Kibayasi is a good person who had some problems controlling his anger. These anger issues left unchecked and untreated led to a momentary loss of control resulting in Dylan Kibayasi's death."

Thus, the trial court's statement that Kibayasi had an anger problem on the date in question that led to Dylan's death is well supported by the record. The court properly weighed the circumstances surrounding Dylan's death as well as the other factors in aggravation and mitigation. On reviewing the record, we find that the trial court did not abuse its discretion in sentencing Kibayasi to 35 years in prison.

¶ 67                                   CONCLUSION

¶ 68 We affirm Kibayasi's conviction for first degree murder where the evidence supported a finding that he knew his actions created a strong probability of death or great bodily harm for Dylan.

¶ 69 We also find no abuse of discretion by the trial court in sentencing Kibayasi to 35 years in prison. The sentence is within the statutory range and the trial court considered proper factors in aggravation and mitigation.

¶ 70 Affirmed.