2022 IL App (1st) 191545-U

FIRST DISTRICT,
FIRST DIVISION
September 26, 2022

No. 1-19-1545

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 18410 |
| TYRONDA BENNETT, | ) ) | Honorable |
| Defendant-Appellant. | ) ) ) | Patrick Coughlin, Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1        *Held*:   Defendant's convictions for first degree murder and aggravated battery are affirmed where (1) the evidence was sufficient to prove specific intent to kill, (2) counsel was not ineffective for failing to introduce evidence pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), and (3) her sentence was not excessive.

¶ 2        Following a bench trial, defendant Tyronda Bennett was convicted of first degree murder

(720 ILCS 5/9-1(a)(1), (2) (West 2014)) of Diamond Donovan and aggravated battery (720 ILCS

5/12-3.05(f)(1) (West 2014)) of Ottis[1] Allen. The trial court sentenced defendant to consecutive

_____

[1]Allen's first name is spelled inconsistently throughout the record. When Allen testified at trial, he indicated that his first name is "Ottis," so we use that spelling here.

terms of 23 years' imprisonment for the murder and 2 years' imprisonment for the aggravated battery. On appeal, defendant argues that (1) the evidence was insufficient to prove specific intent to kill because she was intoxicated, (2) counsel was ineffective for failing to introduce evidence of a prior violent act of Allen, and (3) her sentence is excessive. For the following reasons, we affirm.

¶ 3                                                              BACKGROUND

¶ 4          Immediately prior to trial, defendant filed a motion *in limine* to admit evidence pursuant to *People v. Lynch*, 104 Ill. 2d 194, 200 (1984). The trial court ruled that defendant could introduce evidence of "an incident in 2011 wherein Mr. Allen—without provocation, and without being confronted with force or threat of force—kicked [defendant] in the face with his foot which resulted in injury to [her] front teeth."

¶ 5          At trial, the evidence showed that on September 20, 2014, Allen was celebrating his birthday with defendant, who was his girlfriend at the time. Sometime after 11:00 p.m., Allen's cousin, William Humphrey, drove them to buy "a fifth of Hennessy" before picking up Donovan in Ford Heights. They eventually bought two more pints of Hennessey and drove to defendant's apartment in Robbins, Illinois.

¶ 6          Ashley Calvin, defendant's cousin and roommate, testified that she woke up at 3:00 or 4:00 a.m. to the sound of people arriving at the apartment. After seeing defendant, Allen, Donovan, and Humphrey, she went back to sleep.

¶ 7          The group played cards and continued drinking. Allen testified that he and defendant shared "a fifth and a pint" of Hennessey throughout the night. At some point, defendant and Donovan started "bickering" about who was the "baddest b***." Allen and Humphrey were playing Dominoes in the dining room until Humphrey went into the living room and "dozed off."

¶ 8    Defendant told Donovan she was going to show her an "old school move." She "put her leg behind [Donovan] and pushed her" to the ground. Donovan got up and defendant did the same move again. This time, Donovan got upset and they "started arguing back and forth." Then defendant "did it again" and started "stomping" on Donovan. Allen testified that "[t]here was no fight at first. [Donovan] agreed like, okay, show me," but it "got serious at the end. There was no play."

¶ 9    Allen "broke it up," picked up Donovan, and "put her in [a] chair." He told defendant, "Stop doing that, you know you can beat her" and "toss[ed]" defendant onto the ground to show her that "she was being a bully." Defendant got up, went to the kitchen, and "came back down the hall" with a five or six-inch long knife in her hand. When Allen asked, "so you gonna stab me," defendant "ran at [him] with her hands up and *** swung at [him]," stabbing him in the arm. Allen "grabbed [his] shirt off the chair and put it real tight on [his] arm and headed towards the door."

¶ 10    On cross-examination, defense counsel asked Allen if he kicked defendant in the face during a 2011 "verbal altercation." Allen testified that defendant attacked him and scratched his face and he defended himself by "blocking," but he denied kicking defendant or striking her in the mouth.

¶ 11    Calvin testified that she woke up to a loud "thumping" noise. She came out of her room and saw defendant "stomping on [Donovan's]" neck and head with her foot. Calvin pulled defendant off of Donovan and went back to sleep.

¶ 12    Later, Calvin heard "some more thumping." She got up and saw Allen "standing over" defendant in the kitchen, saying something to her in a "playful tone." She heard "something hitting the counter" and Allen saying, "you gonna stab me." Defendant "rushed towards [Allen]"

with a "long steak knife" and "swung the knife" at him. Calvin closed her bedroom door before seeing the knife "hit the skin," but she heard Allen say, "you crazy b***, you stabbing me."

¶ 13        Humphrey heard a "commotion," but did not open his eyes until Allen woke him up in a "frantic state" because he had been stabbed in the shoulder. Defendant approached Humphrey with the knife, "telling [him] to get [Allen] out of here." Defendant added, "Take this b*** with you," referring to Donovan, who was in the dining room. As Humphrey "rushed" downstairs, he heard "a thud like a sack of potatoes falling," but did not look back. Humphrey drove Allen to the hospital to be treated for his injuries.

¶ 14        From her bedroom, Calvin also heard defendant say, "Don't leave her. Take her with you" and "[s]omething *** falling down the stairs." Calvin did not come out of her bedroom "until it got quiet." At this point, defendant "buzzed [her]" to come downstairs. She noticed "a lot of blood on the stairways and on the wall." Outside, she saw defendant "standing over [Donovan] like she was telling her to wake up." Donovan was on the ground, gasping for air. Calvin saw the same knife that defendant swung at Allen on the ground "right next to [defendant]." Calvin ran upstairs to get her cell phone to call 911. When she returned, defendant told her to "hang up" and to "tell her the boyfriend did it, tell her he stabbed her and turned it on her," referring to Allen. Defendant also told her that she "hid the knife" and she "didn't want to get in trouble."

¶ 15        Defendant and Calvin were both arrested at the scene. Calvin admitted that during her first interview with the police, she "withheld information" and did not "give them the full story" because she "didn't want her cousin to get in trouble." She told the police "everything" after they told her she would be "going to jail for a long time" if she did not start telling the truth.

¶ 16        Assistant Medical Examiner Steven White testified that Donovan suffered a stab wound to the chest, consistent with a wound from a kitchen knife; incised wounds on her forehead and left forearm, consistent with knife wounds; contusions around both of her eyes; hemorrhaging on her inner eyes and eyelids; and "a hemorrhage consistent with injury on the top of the scalp." White also testified that the trajectory of the stab wound to the chest was "downward" and that the incised wound on the "back of her left forearm" was "consistent with a defensive injury." Given "the trajectory of the wound and the depth that it actually went down so far into the edge of the heart, [he] had never seen that in an accidental knife wound." In White's opinion, the cause of death was a stab wound to the chest and the manner of death was homicide.

¶ 17        When the defense indicated that it planned to "proceed with a live witness," the State objected, arguing that *Lynch* did not apply because defendant "was the initial aggressor" against Allen.[2] The trial court thought that it was a "great stretch" that defendant "would have felt the need to arm herself with a deadly weapon after she was in this takedown thing" with Allen, but ruled that the defense could call its witness "[o]ut of an abundance of caution." Ultimately, defense counsel decided to proceed "in another manner."

¶ 18        The defense called detective Bobbie Young, who had conducted a videotaped interview of Calvin at the police station, which was admitted into evidence. Young denied that Calvin "changed her story throughout the course of her first interview" but admitted that he "probably" asked Calvin whether she loved her cousin enough to spend the rest of her life in jail.

¶ 19        The trial court found defendant guilty of first degree murder and aggravated battery, indicating that Allen's testimony explaining why defendant armed herself with a knife that night

_____

[2]While defense counsel did not indicate who the "live witness" was, he previously indicated that he intended to call Jackilina Washington. The motion *in limine* also indicated that Washington would testify to the 2011 incident.

was "clear and compelling." The court explained that while Calvin only saw "bits and pieces" of what happened, "what she does see is corroborated and supported" by Allen and Humphrey; that the doctor testified to a "rather catastrophic wound to the chest"; that it was "very significant that the knife is found by the victim's body with the defendant standing right there"; and that defendant showed "consciousness of guilt" by telling Calvin to hang up with 911, "[t]ell the police that the boyfriend did it," and hiding the knife. The trial court found that the State had proven "a very, very compelling circumstantial case against the defendant."

¶ 20     In imposing sentence, the court considered defendant's presentence investigation report (PSI), noting that defendant had no prior felony convictions. While acknowledging that "alcohol played a factor," the court found that it was "clear that the defendant was certainly aware of her actions that night." After considering "all of the statutory factors in aggravation and mitigation," the court sentenced defendant to consecutive terms of 23 years' imprisonment for murder and 2 years' imprisonment for aggravated battery.

¶ 21                                          ANALYSIS

¶ 22                              Sufficiency of the Evidence

¶ 23     Defendant argues that her conviction for first degree murder should be reduced to involuntary manslaughter because "there was insufficient evidence presented that [she] had the specific intent to kill and where [she] was extremely intoxicated at the time of the crime."

¶ 24     When reviewing the sufficiency of the evidence, we consider whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Harris*, 2018 IL 121932, ¶ 26. We will not retry the defendant and must draw all reasonable inferences in favor of the prosecution. *Harris*, 2018

IL 121932, ¶ 26. A criminal conviction will not be set aside unless the evidence is "so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 25        Here, defendant was convicted of both "intentional" and "knowing" first degree murder under 720 ILCS 5/9-1(a)(1), (2). *People v. Smith*, 223 Ill. 2d 1, 16 (2009) (referring to subsections (a)(1) and (a)(2) of section 9-1 as "intentional" and "knowing" murder, respectively). The "key difference" between first degree murder and involuntary manslaughter is the requisite mental state. *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 42. A person commits first degree murder when he or she "either intends to kill or do great bodily harm *** or knows that such acts will cause death ***", or "knows" that their conduct "create[s] a strong probability of death or great bodily harm." 720 ILCS 5/9-1(a) (1), (2). A person acts knowingly if they are "consciously aware" that their conduct was "practically certain to result in death or great bodily harm." *People v. Jones*, 404 Ill. App. 3d 734, 742 (2010).

¶ 26        In contrast, involuntary manslaughter requires that a person "unintentionally kills an individual" by "recklessly" performing acts that are "likely to cause death or great bodily harm." 720 ILCS 5/9-3(a) (West 2014). Whether a defendant "acted knowingly or with intent may be inferred from the circumstances surrounding the incident, defendant's conduct, and the nature and severity of the victim's injuries." *Kibayasi*, 2013 IL App (1st) 112291, ¶ 42. Intent may also be inferred from "an act, the direct and natural tendency of which is to destroy another's life." *People v. Hill*, 276 Ill. App. 3d 683, 689 (1995).

¶ 27        We find that the evidence was sufficient to show both that defendant intended to kill Donovan and that she knew her conduct created a "strong probability of death." As outlined above, Donovan suffered a knife wound to the chest, injuring her right lung, as well as incised

wounds on her forehead and forearm. The incised wound on her forearm was consistent with a "defensive injury," suggesting that there had been a struggle between defendant and Donovan. Additionally, the medical examiner had "never seen" a stab wound like this in an "accidental knife wound," given that it went "so far down into the edge of the heart."

¶ 28        Defendant's knowledge and intent to kill can be inferred from her act of stabbing Donovan in the chest with a five to six-inch long knife and inflicting a "catastrophic wound" to her chest. See *In re T.G.*, 285 Ill. App. 3d 828, 844 (1996) (defendant's "specific intent to kill [the victim] was reasonably inferred from his voluntary and wilful act of lunging at [the victim] with the knife and stabbing him in the chest, the tendency of which was to destroy [the victim's] life"); *Kibayasi*, 2013 IL App (1st) 112291, ¶ 43 (finding that "a rational trier of fact could properly infer from the medical testimony, as to the extent and severity of [the victim's] injuries, that [defendant] knew that his actions created a strong probability of death or great bodily harm").

¶ 29        Defendant argues that "[g]iven *** [her] high level of intoxication, she lacked the requisite *mens rea* for first degree murder." Although she concedes that voluntary intoxication is not an affirmative defense, she argues that the legislative history of section 6-3 of the Criminal Code of 1961 (720 ILCS 5/6-3 (West 2014) (formerly Ill. Rev. Stat. ch. 38, ¶ 6-3)) suggests that "voluntary intoxication may still be introduced to show the State has not proven *mens rea* beyond a reasonable doubt."

¶ 30        "The primary objective of statutory construction is to ascertain and give effect to the legislature's intent," which is most reliably indicated by the "plain and ordinary" language of the statute. *People v. Gutman*, 2011 IL 110338, ¶ 12. We may only look to other interpretive aids, such as legislative history, when the statutory language is ambiguous. *In re Detention of Powell*,

217 Ill. 2d 123, 135 (2005). We "must not depart from the plain language or read into it exceptions, limitations, or conditions that the legislature did not express." *People v. Dupree*, 2018 IL 122307, ¶ 31.

¶ 31        Before 1988, section 6-3 provided that an intoxicated or drugged person was "criminally responsible for conduct unless the condition either: (a) *Negatives the existence of a mental state which is an element of the offense*; or (b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." (Emphasis added.) Ill. Rev. Stat. ch. 38, ¶ 6-3; *People v. Rutigliano*, 2020 IL App (1st) 171729, ¶ 69. In 1988, section 6-3 was amended to provide that an intoxicated or drugged person was criminally responsible for conduct unless such condition either:

> "(a) Is so extreme as to suspend the power of reason and *render him incapable of forming a specific intent which is an element of the offense*; or
>
> (b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to confirm his conduct with the requirements of law." (Emphasis added.) 720 ILCS 5/6-3 (West 2000).

¶ 32        Section 6-3 was amended again in 2002, and currently provides that intoxication is only a defense if it is involuntarily produced *and* deprives the defendant of the requisite mental state or capacity for the crime. 720 ILCS 5/6-3 (West 2014). Because this statutory language is unambiguous, we need not examine its legislative history. See *In re Detention of Powell*, 217 Ill. 2d at 135 ("Where the language of a statute is clear and unambiguous, courts may not resort to aids of statutory construction").

¶ 33          Defendant relies on *People v. Slabon*, 2018 IL App (1st) 150149, ¶ 33, to argue that "a person's state of voluntary intoxication may be relevant in the commission of specific intent crimes ***." The *Slabon* court held that "the omission of voluntary intoxication in section 6-3 [does not] mean[] this condition is never relevant in criminal proceedings" because courts have "long recognized that 'where voluntary intoxication is so extreme as to suspend entirely the power of reasoning' a defendant is incapable of forming a specific intent or malice." *Id.* (quoting *People v. Cunningham*, 123 Ill. App. 2d 190, 209 (1970)). In *Slabon*, the court relied on *Cunningham*, 123 Ill. App. 2d at 209, which was decided prior to section 6-3 being amended.

¶ 34          In *People v. Grayer*, 2022 IL App (1st) 210808, ¶ 42, this court recently held that the "*Slabon* court's reliance on *Cunningham* for the proposition that a defendant's voluntary intoxication may be relevant where it is so extreme as to 'suspend entirely the power of reasoning,' such that a defendant is incapable of forming a specific intent or malice is *** misplaced. *** Simply put, section 6-3 now provides that voluntary intoxication is not an excuse for criminal conduct." *Id.* (citing *People v. Jackson*, 362 Ill. App. 3d 1196, 1201 (2006)).

¶ 35          As previously discussed, defendant was convicted of both "intentional" and "knowing" murder. "Knowing" murder is not a specific intent crime, so voluntary intoxication would be inapplicable to negate defendant's *mens rea* in that regard. See *People v. Slater*, 393 Ill. App. 3d 977, 985-86 (2009) (explaining that it is not necessary for the State to prove specific intent to kill for "knowing murder"); *Slabon*, 2018 IL App (1st) 150149, ¶ 33 (voluntary intoxication may still be "relevant in the commission of specific intent crimes").

¶ 36          In any event, it is not necessary to decide this issue because there is no evidence in this case that defendant's intoxication was " 'so extreme' as to suspend entirely [her] power of reasoning." See *Grayer*, 2022 IL App (1st) 210808, ¶ 43. On the contrary, defendant told Calvin

she "didn't want to get in trouble," to "hang up" with 911 and to tell the police that "the boyfriend did it." She also hid the knife, all of which shows defendant's "power of reasoning" was not suspended at all, much less entirely suspended. The record confirms that defendant was completely aware of both her actions and the serious consequences of those actions. See, *e.g.*, *id.* (finding that "defendant's intoxication was [not] 'so extreme' as to suspend entirely his power of reasoning" where he had a grasp on directions, and taunted and chased the victim). When viewed in the light most favorable to the State, the evidence was undeniably sufficient to prove the essential elements of the offense of murder beyond a reasonable doubt.

¶ 37                                    Ineffective Assistance of Counsel

¶ 38        With respect to the aggravated battery conviction, defendant asserts that counsel was ineffective because "despite having secured a ruling allowing evidence of Otis Allen's prior violent act towards [defendant], counsel failed to introduce testimony supporting those acts." After Allen denied kicking defendant in the face at trial, defense counsel planned to call another witness to testify about the 2011 incident. Defendant argues that this testimony would have "demonstrated Allen's history of violent behavior towards [her]" that "could have provided crucial support [of] her claim of self defense."

¶ 39        To establish ineffective assistance of counsel, defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced her. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Domagala*, 2013 IL 113688, ¶ 36. Specifically, she must show that counsel's performance was "objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). Where it is "easier to dispose of an ineffectiveness claim on the

ground of lack of sufficient prejudice, *** that course should be followed." *Strickland*, 466 U.S. at 697.

¶ 40      It is well established that "when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor ***." *Lynch*, 104 Ill. 2d at 200. Evidence of the victim's violent character may be relevant "(1) to show that the defendant's knowledge of the victim's behavior and tendencies affected the defendant's perceptions of and reactions to the victim's actions, and (2) to support the defendant's version of events where there are conflicting accounts." *People v. Morgan*, 197 Ill. 2d 404, 454 (2001) (citing *Lynch*, 104 Ill. 2d at 191-201).

¶ 41      In response to Allen's "takedown move," defendant went to the kitchen, got a knife, and stabbed Allen, even though Allen was speaking to defendant in a "playful" tone and "wasn't aggressive at all." Here, the evidence shows that Allen's "takedown move" was over and done before defendant walked into the kitchen, retrieved a knife, walked back into the living room, and stabbed Allen. Evidence that Allen had kicked defendant in the face three years earlier would not have supported defendant's theory of self-defense or changed the outcome at trial. Therefore, defendant was not prejudiced by counsel's decision to "proceed in another manner." See *People v. Salas*, 2011 IL App (1st) 091880, ¶ 94 (counsel was not ineffective for failing to introduce *Lynch* evidence where "the theory of self-defense was not supported by the evidence").

¶ 42                                            Excessive Sentence

¶ 43      Finally, defendant argues that her 23-year sentence for first degree murder is "excessive in light of her significant remorse and lack of criminal history." The trial court is required to give careful consideration to all factors in aggravation and mitigation, including "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social

environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). When mitigating evidence is presented, "it is presumed that the court considered that evidence in imposing the defendant's sentence." *People v. Himber*, 2020 IL App (1st) 162182, ¶ 59. A reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). We will not alter the trial court's sentence absent an abuse of discretion. *Id.* at 209-210.

¶ 44    Defendant was facing a prison term of "not less than 20 years and not more than 60 years" for first degree murder. 730 ILCS 5/5-4.5-20 (West 2018). Because her sentence is within the low end of the statutory limits, we presume it is proper absent a showing that the court did not consider the relevant sentencing factors. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38.

¶ 45    In imposing sentence, the record shows that the trial court considered all the statutory factors in aggravation and mitigation including, the nature and circumstances of the crime and defendant's limited criminal history. While defendant asserts that her remorse and lack of criminal history warrant a reduction in sentence, "the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, nor does the presence of mitigating factors either require a minimum sentence or preclude a maximum sentence." *People v. Harmon*, 2015 IL 122345, ¶ 123. Because the trial court "carefully considered and balanced the significant aggravating and mitigating evidence presented at the sentencing hearing," defendant cannot overcome the presumption that her sentence is proper. See *Himber*, 2020 IL App (1st) 162182, ¶ 61; see also *People v. Jones*, 2015 IL App (1st) 142597, ¶ 40 (defendant's 42-year sentence was not excessive where the court "reviewed [defendant's] criminal history and specifically credited the proffered mitigation evidence").

¶ 46                                        CONCLUSION

¶ 47          For the foregoing reasons, defendant's convictions for first degree murder and aggravated

battery are affirmed.

¶ 48          Affirmed.