# Illinois Official Reports

## Appellate Court

---

### *People v. Doolan*, 2016 IL App (1st) 141780

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MATTHEW DOOLAN, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-14-1780 |
| Filed | November 9, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-4654; the Hon. John Joseph Hynes, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | Michael D. Ettinger, of Ettinger & Besbekos, P.C., of Palos Heights, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.<br>Justices Lavin and Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a jury trial, defendant Matthew Doolan was convicted of first degree murder, vehicular invasion, and aggravated battery and sentenced to an aggregate 24 years' imprisonment. On appeal, defendant contends that (1) the State did not prove him guilty beyond a reasonable doubt of first degree murder and vehicular invasion, and (2) his conviction for first degree murder should be reduced to involuntary manslaughter.[1] We affirm defendant's convictions but, at the State's request, amend the mittimus to reflect the correct offenses.

¶ 2        Defendant, along with codefendants Stephen Miller and Marchello Cappelletti, was charged, in relevant part, with first degree murder, vehicular invasion, and aggravated battery. Defendant and Miller were tried jointly. At trial, the State proceeded against both defendant and Miller on one count of intentional murder (720 ILCS 5/9-1(a)(1) (West Supp. 2009)), one count of knowing murder (720 ILCS 5/9-1(a)(2) (West Supp. 2009)), one count of felony murder (720 ILCS 5/9-1(a)(3) (West Supp. 2009)), one count of vehicular invasion (720 ILCS 5/12-11.1(a) (West 2010)), and one count of aggravated battery "on or about a public way" (720 ILCS 5/12-4(b)(8) (West Supp. 2009)).[2] The charges arose from an altercation that occurred at a Shell gas station, located at 87th Street and Harlem Avenue in Bridgeview, shortly after 12 a.m. on June 23, 2010. The trial evidence included videos compiled from surveillance cameras located inside and outside the gas station store. We have viewed the videos, which are included in the record, and, throughout this order, will describe their content as it relates to the witness testimony.

¶ 3        At trial, Ali Dajani testified that he rode to the gas station with Abdallah and Rahman in Rahman's black Maxima just before midnight on June 22, 2010. Rahman drove, Abdallah sat in the front passenger seat, and Dajani sat in the backseat. As they pulled into the gas station, Dajani noticed defendant and two other men standing by a van on the west side. Dajani identified defendant in court and estimated that he was 6 feet tall and weighed 280 to 300 pounds on the day of the incident. Rahman parked at a pump on the east side of the gas station, near a man cleaning the "rims" of a silver car. Dajani denied that he, Abdallah, or Rahman flashed gang signs or said anything.

¶ 4        The State presented video from surveillance cameras located inside and outside of the store while Dajani testified. The video lacks an audio component, but we incorporate the dialogue described by Dajani. In the video, Dajani identified Rahman standing at a pump while Dajani and Abdallah sat in the Maxima. Miller, wearing a black shirt, pants, and black shoes, walked past the Maxima "[f]lashing gang signs" and shouting "Ambrose." Defendant, wearing a blue shirt, stood a few feet from the vehicle, holding a cell phone and shouting, "Ambrose." Miller leaned toward the Maxima's front passenger side window. Abdallah opened the door slightly, said "[g]o fuck yourself," and closed the door. Miller turned toward defendant and pointed to the vehicle. A few seconds later, defendant and Miller approached the front passenger side

---

[1]Defendant does not challenge his conviction or sentence for aggravated battery.

[2]Miller was convicted of first degree murder, vehicular invasion, and aggravated battery. Cappelletti was charged with the same offenses and entered a plea of guilty, but the record does not indicate the charge or charges to which he pled. Neither Miller nor Cappelletti is a party to this appeal.

door, again saying, "Ambrose." Abdallah held the door partially open and said, "F off" and "leave us alone."

¶ 5 According to Dajani, Miller "rip[ped] the car door open" and kicked into the vehicle, striking Abdallah "[b]y his upper chest, face area." The video depicts Miller next to the front passenger side door, his back to the camera, moving his left hand across his body and to the right. Then, Miller placed his right hand on the open door and his left hand on the roof of the vehicle, raised his right leg, and leaned backward and to the left. Defendant stood just behind Miller, facing Abdallah, who swore at Miller, and exited the Maxima. Dajani observed defendant draw back his left arm and punch Abdallah on the right side of the head, causing him to "stumble." The video depicts defendant squaring his body toward Abdallah and extending his left arm, his fist positioned beside Abdallah's head, while Abdallah leaned slightly with his feet together. Abdallah ran after Miller. Dajani testified that he lost sight of Abdallah and did not hear Abdallah or Miller say anything.

¶ 6 Dajani exited the Maxima and observed Rahman and Cappelletti fighting at the front of the vehicle. Defendant faced Dajani with his hands fisted but his arms down, then pointed at Dajani and told him to "back off." Defendant punched Rahman, and Dajani punched Cappelletti, grabbed his shirt, and pulled him away. Defendant and Cappelletti stood across from Rahman and Dajani. Defendant said, "[t]wo on two," and Dajani said, "[i]t's okay." Dajani heard the sound of a bottle breaking and observed Rahman fall to the ground. Then, according to Dajani, Miller threw "another bottle" at Rahman's head. Afterwards, Miller and defendant went to the other side of the gas station. Dajani found Rahman lying "[u]nderneath" the Maxima. He located Abdallah on the opposite side of the gas station, bleeding and unresponsive.

¶ 7 On cross-examination, Dajani acknowledged telling a detective that defendant, Miller, and Cappelletti yelled at the man who was cleaning the silver car. He acknowledged that the surveillance video depicted a "black line" between defendant's fist and Abdallah's face, and that he might not have told the detective that defendant punched Abdallah because there was "a lot going on at that time." Dajani denied that defendant made any "physical contact" with him or that defendant kicked Abdallah.

¶ 8 Rahman testified that he noticed three individuals near a van as he drove into the gas station with Abdallah and Dajani. He had encountered the van on a prior occasion and had observed "gang members" in the van "throwing gang signs." Rahman denied that he, Dajani, or Abdallah spoke to the individuals or flashed gang signs. He parked by a pump and exited the vehicle, then heard three voices behind him saying, "Ambrose, Ambrose love." Abdallah responded, "go fuck yourselves."

¶ 9 The State produced the same surveillance videos that were played during Dajani's testimony. Here, we incorporate the dialogue described by Rahman. In the video, Rahman stood at the pump with his back to the camera. While defendant and Miller confronted Abdallah on the other side of the Maxima, Cappelletti walked in front of the vehicle and lifted a trash can over his head, shouting, "Ambrose love" and "Ambrose." Rahman told Cappelletti, "we are not with that shit," and ran to the front of the vehicle, "block[ing]" the trash can as Cappelletti threw it down. Rahman heard Abdallah swear. Then, Cappelletti struck Rahman in the face and Rahman placed Cappelletti in a "head lock." Both men fell to the ground, hitting each other, until Rahman felt someone punch him in the head and pull him away.

¶ 10 Rahman and Dajani stood across from defendant and Cappelletti, who were shouting "Ambrose." Defendant said, "two on two," and Dajani said, "okay, let's go." Rahman felt someone strike his head from behind and fell to the ground, unable to feel "anything from [the] neck down." The video depicts Miller running toward Rahman, swinging his right arm, and throwing a "glass bottle" at Rahman's head. Rahman lay near the Maxima, going "in and out" of consciousness. In the video, Rahman raised his arm above his face and Miller threw a second bottle at his head. Rahman saw glass and blood "everywhere" and lost consciousness. He awoke at the hospital, with bruises and cuts to his face and the back of his head, and received stitches to his upper lip.

¶ 11 On cross-examination, Rahman testified that he did not see anyone attempt to open the door of his car or kick or reach into the vehicle while he was at the pump. He did not recall telling police that he observed anyone kick or reach into the vehicle and did not see defendant strike him or anyone else during the altercation. He did not hear anyone say, "Ambrose killers." After Miller hit him on the head, Rahman did not recall anyone saying, "stop, that's enough, let's go."

¶ 12 James Conroyd testified that he formerly belonged to the Ambrose street gang with Cappelletti and defendant, who he identified in court by the nickname "Fat Guy." Conroyd demonstrated the gang's hand signal and stated that its colors were "[b]aby blue and black." At approximately 11 p.m. on June 22, 2010, Conroyd was drinking beer at "the Magnotti's" with Cappelletti, Miller, and defendant. Afterwards, they conversed with a police officer, Officer Guerra, and left in defendant's gold van. Cappelletti cut his hand on a beer bottle, so defendant stopped at the gas station at 87th Street and Harlem Avenue.

¶ 13 The State showed video compiled from surveillance cameras located inside the gas station store.[3] In the video, Conroyd identified himself entering the store, along with defendant (who was wearing a blue shirt), Cappelletti (who was wearing a white shirt), and Miller (who was wearing a black shirt). The video, in relevant part, depicted defendant, Miller, and Conroyd standing near a doorway on the side of the store opposite from where they had parked. According to Conroyd, a man was cleaning the "rims" of his vehicle outside the door. Defendant and Miller shouted and flashed gang signs used by Ambrose and "S.D." (Satan Disciples). Conroyd returned to the backseat of the van and did not observe what happened on the other side of the gas station. He did not see defendant strike, kick, or throw anyone to the ground.

¶ 14 The State played video compiled from surveillance cameras located around the gas station. In the video, Conroyd identified Abdallah "on top" of the hood of the van, and stated that he believed Abdallah subsequently "fell off the van." Conroyd testified that Abdallah was chasing Miller and "screaming" the phrase "A.K.," meaning "Ambrose Killer." Miller retrieved a bottle from inside the van. Afterward, Miller, Cappelletti, and defendant returned to the van and defendant drove them away. Conroyd acknowledged telling police that he did not hear Abdallah say "A.K." but testified that he meant he could not hear what Abdallah had said on the other side of the store.

---

[3]The videos taken inside the store include an audio component. The State entered a stipulation between the parties that "the audio and video portions of the videotape are not synchronized." We will set forth dialogue from the video as needed elsewhere in this order.

¶ 15        Robert Rezzardi testified that he was working as a cashier at the gas station on the day of the altercation. At approximately midnight, he noticed a gold van parked on the west side of the gas station and observed defendant, Miller, Cappelletti, and Conroyd enter the store. Cappelletti had a cut on his hand and went to the bathroom, but Miller and defendant, who he identified in court, stayed in the store, "flashing gang signs and yelling gang slurs."

¶ 16        The State showed surveillance video from inside the store. In the video, Rezzardi identified defendant and Miller looking out the east door. According to Rezzardi, an individual was cleaning the tires of a silver car parked outside. A black vehicle pulled into the gas station, and the men exited the store, "yelling at the passenger in the front seat." Rezzardi stayed inside and heard faint noises, including Miller yelling, but denied hearing anyone yell, "A.K." Rezzardi observed "parts" of the altercation, including Miller "kick[ing] inside the car." Rezzardi called the police. After the van left, he went outside and noticed two men lying on the ground. One man was "wheezing" and the other had blood "pooling from his face."

¶ 17        On cross-examination, Rezzardi testified that the "gang signs" that he observed were "just hand signals." He denied observing defendant "throw any gang signs" and did not recall whether defendant made "any type of gang comment." He did not see defendant strike anyone, kick anyone, or enter the black vehicle. He did not see anyone from the silver vehicle "join" the people from the black car during the fight and did not recall telling police that he observed that occur.

¶ 18        The trial court qualified Burbank police officer Roberto Guerra as an expert "in the field of gangs in Burbank." Guerra testified that photographs of defendant and Miller's tattoos, which were published to the jury, depicted symbols used by the Ambrose street gang. He learned that defendant belonged to Ambrose after an encounter with him in March 2008.

¶ 19        Between 10:30 p.m. and 10:45 p.m. on June 22, 2010, Guerra encountered defendant, Miller, and other individuals in Burbank and observed defendant's van nearby. Guerra told defendant to "get out of Burbank." Just after midnight, Guerra received a radio call mentioning a fight at the gas station and a partial license plate number, which he recognized as defendant's license plate. Guerra went to the gas station and observed two individuals on the ground. Afterward, he provided other officers with photographs of defendant and his van.

¶ 20        The State produced video compiled from surveillance cameras located inside and outside the gas station store. In video from inside the store, Guerra identified defendant standing in a doorway "throwing" gang signals used by the Ambrose, Latin Kings, and Satan Disciples street gangs. Guerra also identified a voice on the video saying, "Ambrose S.D.K.," meaning, "Sat[a]n Disciple Killer." In the video from outside the store, Guerra identified Miller near Rahman's car, "throwing" gang signs used by the Latin Kings and Satan Disciples. According to Guerra, some of the signals conveyed "disrespect" and were intended "to see what kind of reaction the other people are going to do," including, "[i]f they're going to jump out and fight, or just ignore it." In the video, he did not observe anyone in Rahman's car displaying gang signals.

¶ 21        Officer Edwin Sullivan testified that he arrived at the gas station "a little after midnight" and observed Abdallah lying on the ground on the west side. He was unresponsive and not breathing. On the east side, Sullivan observed Rahman lying with his head beneath the

Maxima, "bleeding heavily from the mouth." Sullivan called for ambulances and drove Dajani, Michael Lapacinskas, and James Andrysiak to the Bridgeview police department.[4]

¶ 22     Paramedic Anthony Oakley testified that he arrived at the gas station at approximately 12:17 a.m. and observed Rahman lying partially beneath the Maxima, surrounded by glass and blood. Oakley determined that Rahman was breathing but unresponsive and noticed that he had a "good amount" of blood on his head. Oakley and his partner moved Rahman to an ambulance, suctioned blood from his airway, and brought him to the hospital.

¶ 23     Paramedic Mark Toczek testified that he arrived at the gas station at approximately 12:10 a.m. and observed Abdallah lying with the right side of his face on the ground. He was not breathing, did not have a pulse, and his skin appeared blue. Toczek and other paramedics moved Abdallah to an ambulance and administered an EKG, which indicated that his heart was "quivering" but "not pumping." The paramedics could not reestablish Abdallah's breathing or circulation, and according to Toczek, Abdallah's heart could not "sustain life" when the ambulance arrived at the hospital.

¶ 24     Dr. Mitra Kalelkar performed the autopsy on Abdallah. At the time of his death, Abdallah was 5 feet, 11 inches tall and weighed 177 pounds. The autopsy revealed that he had abrasions on his right cheek bone, contusions and lacerations on his right upper and lower lips, and abrasions on his chin, neck, and right knee. He had swelling in his brain, blood in his lungs, and a hemorrhage in the muscles of his left temple. According to Dr. Kalelkar, Abdallah had "cardiomegaly," meaning that his heart was abnormally large, and "right ventricular hypertrophy," meaning that the muscles on the right side of his heart were abnormally thick. Consequently, his heart had to "pump harder" than normal in order to function. Dr. Kalelkar noted that Abdallah also had a "nodular" liver and an enlarged spleen containing blood.

¶ 25     Dr. Kalelkar opined that Abdallah's facial injuries were consistent with being kicked or punched and that the hemorrhage could have resulted from "blunt trauma." While some of the facial injuries could have been caused by contact with the pavement, Dr. Kalelkar stated that it was "unlikely" that the hemorrhage or lip injuries were caused in that manner. She stated that the swelling in Abdallah's brain could have resulted from oxygen deprivation due to his head injury or his heart not pumping blood. She did not recall telling a police officer that Abdallah had a broken nose and denied that his nose was broken.

¶ 26     Dr. Kalelkar posited that Abdallah's external injuries would not have killed him, but would have caused enough stress to force his enlarged heart "out of rhythm." She stated that the events depicted in the gas station surveillance video, including Abdallah witnessing "his friends being beat up" and his conduct in running and jumping over the hood of the van, could have caused enough stress to kill him even if nobody actually struck him. According to Dr. Kalelkar, Abdallah "died as a result of stress due to altercation," with "multiple blunt force trauma to his face" being a significant factor in his death, and the manner of his death was homicide.

¶ 27     At the close of the State's case, defendant made a motion for directed verdict, which the trial court denied.

¶ 28     Officer Adam Gulczynski testified that he interviewed Dajani at the Bridgeview police department shortly after 2 a.m. on June 23, 2010. According to Gulczynski, Dajani was "upset"

---

[4]The State produced death certificates for Lapacinskas and Andrysiak, which were entered into evidence.

and his shirt was "ripped." Dajani told Gulczynski that "three subjects" yelled "Ambrose" as they approached Rahman's Maxima, and that Miller, who was wearing "possible dark Dickie shorts and unknown footwear opened the front passenger door, [and] kicked at him while calling Ambrose and doing hand gestures," including "throwing down the Latin King hand signal." Gulczynski's report did not indicate whether Dajani claimed that the men yelled "Ambrose" at other times during the altercation. Gulczynski stated that, per his report, Dajani claimed that at one point he observed defendant "beg[i]n" to punch Rahman, and then, at a later time, observed defendant "actually complete a punch."

¶ 29    Officer Barry Churin testified that he interviewed Rahman at the hospital at approximately 2:15 a.m. on June 23, 2010. Prior to the interview, Churin learned that Rahman was being treated for a possible head injury and had received a CT scan and stitches. Churin described Rahman as "emotional." According to Churin, Rahman did not state that defendant struck anyone, but claimed to have heard defendant say, "stop, that's enough, let's go." Rahman did not mention that he "put somebody in a headlock" or "punched several people."

¶ 30    Officer Richard Brown testified that he interviewed Rezzardi at the Bridgeview police department at approximately 4 a.m. on June 23, 2010. Rezzardi was "distraught" during the interview and indicated that an individual from a silver car "went to help the guys in the black car once everybody began fighting."

¶ 31    Investigator Thomas Shader testified that he spoke with Dr. Kalelkar on the day she performed Abdallah's autopsy. According to Shader, Dr. Kalelkar stated that Abdallah had suffered a broken nose.

¶ 32    Dr. Michael Kaufman testified that he reviewed Abdallah's autopsy report and video from the gas station surveillance cameras. He concurred with Dr. Kalelkar's opinion that Abdallah died from "stress due to the altercation," and that the manner of death was homicide. Dr. Kaufman opined that Abdallah's heart was "30 or 40 percent" larger than normal for his size and weight, and that his ventricles were "thickened" and "hypertrophied." This condition, according to Dr. Kaufman, rendered Abdallah's heart susceptible to the effects of "fight and flight" hormones like adrenaline.

¶ 33    Dr. Kaufman posited that Abdallah suffered "sudden cardiac death" resulting from "excited delirium syndrome," a condition in which "surges" of adrenaline stimulate a "sensitized heart muscle cell" to enter a "fatal rhythm." Dr. Kaufman stated that excited delirium syndrome cannot be "knowingly" caused by another person but could result from the "emotional overlay of [an] interaction," without "any physical interaction." While Abdallah's physical injuries could have resulted from a punch, a "glancing" kick, or contact with the ground, Dr. Kaufman did not believe they caused his death. Instead, Dr. Kaufman submitted that "the physical aspects of this interaction were really immaterial" in view of the "emotional overlay of everything that took place." According to Dr. Kaufman, Abdallah died from an "accumulation" of adrenaline and no single event during the altercation was fatal.

¶ 34    Following closing arguments, the trial court delivered jury instructions. In relevant part, the court instructed the jury regarding accountability, knowing and intentional murder, and felony murder predicated on vehicular invasion. At defendant's request, the court also issued instructions regarding involuntary manslaughter and self-defense. The jury found both defendant and Miller guilty of first degree murder, vehicular invasion, and aggravated battery.

¶ 35    Defendant filed a motion for new trial with several supplements. He argued, in relevant part, that the evidence did not establish that he was accountable for Miller or Cappelletti's

conduct during the altercation and, therefore, was not proven guilty beyond a reasonable doubt of knowing and intentional murder, felony murder, or vehicular invasion. The trial court denied defendant's motions. Following a sentencing hearing, the court sentenced defendant to 20 years' imprisonment for intentional first degree murder and 4 years' imprisonment for vehicular invasion, to be served consecutively, and three years' imprisonment for aggravated battery, to be served concurrently. Defendant's motion to reconsider sentence was denied.

¶ 36     Defendant raises two issues on appeal.

¶ 37     First, defendant contends that the evidence did not establish that he shared a common criminal intent or design with any codefendants and, therefore, was not accountable for Abdallah's death. According to defendant, he did not engage in "advance planning" to "transport Stephen Miller to a fight," but rather, stopped his van at the gas station so that Cappelletti could treat a wound to his hand. Defendant submits that he was standing away from Rahman's car when Miller and Abdallah's "verbal exchange *** escalated into a physical altercation," and maintains that, although he "appeared to throw a punch in Abdallah's direction," neither the surveillance video nor Dajani's testimony established that he made contact. Defendant also argues that his "participation" in the fight between Cappelletti, Rahman, and Dajani does not render him accountable for Abdallah's death, as Abdallah "had already collapsed and died as a result of [his] enlarged heart simply giving out while chasing Miller." Defendant further reasons that, because no evidence established that he personally entered Rahman's vehicle, his conviction for vehicular invasion also must be reversed.

¶ 38     The State, in response, contends that defendant was accountable for Miller and Cappelletti's conduct while engaging in "collective, gang-motivated violence" against Abdallah, Rahman, and Dajani. According to the State, defendant encouraged and participated in the altercation when he and Miller approached Rahman's vehicle flashing gang signs and shouting "Ambrose." The State maintains that surveillance video establishes that Miller kicked Abdallah inside the vehicle and that defendant, who was physically larger than Abdallah, "staggered" him with a punch to the head. Additionally, the State notes that Dr. Kalelkar found that blunt force trauma to Abdallah's face contributed to his death and argues that, even after defendant punched Abdallah, he participated in the fight involving Cappelletti, Rahman, and Dajani. In view of defendant's involvement in the altercation, his flight from the gas station with Miller and Cappelletti, and his failure to report the incident, the State claims that he was accountable for both the vehicular invasion and Abdallah's murder.

¶ 39     In reply, defendant argues that the State's brief misrepresents both his encounter with Abdallah and Dr. Kalelkar's testimony. According to defendant, even if he did strike Abdallah, any contact was a "glancing blow." Moreover, he submits that Dr. Kalelkar found that Abdallah's death resulted from him "running and leaping" over the van and not from his external injuries. Defendant claims that neither he nor his codefendants went to the gas station anticipating an altercation and that Abdallah was "the aggressor" when he died.

¶ 40     The standard of review on a challenge to the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. The reviewing court will not substitute its judgment for that of the trier of fact on questions involving conflicts in the testimony, the credibility of witnesses, or the weight of the evidence. *Id.* Circumstantial evidence is sufficient to sustain a conviction, and the trier of fact "is not required to disregard inferences which flow normally from the evidence

before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). To sustain a conviction, "[i]t is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Hall*, 194 Ill. 2d 305, 330 (2000). A defendant's conviction will be reversed only if the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 41    The Illinois law regarding first degree murder provides, "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or (3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(1)-(3) (West Supp. 2009). A defendant commits vehicular invasion when he "knowingly, by force and without lawful justification, enters or reaches into the interior of a motor vehicle *** while such motor vehicle is occupied by another person or persons, with the intent to commit therein a theft or felony." 720 ILCS 5/12-11.1(a) (West 2010).

¶ 42    "Accountability is not a crime in and of itself but, rather, a mechanism through which a criminal conviction may result." *People v. Pollock*, 202 Ill. 2d 189, 210 (2002). A defendant is legally accountable for another person's criminal conduct when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2010). To establish that a defendant intended to promote or facilitate a crime, "the State may present evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Fernandez*, 2014 IL 115527, ¶ 13. "Under the common-design rule, if 'two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.' " *Id.* (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)).

¶ 43    A verbal agreement between offenders is "not necessary to establish a common purpose to commit a crime." *People v. Perez*, 189 Ill. 2d 254, 267 (2000). Rather, the trier of fact may infer accountability from "the circumstances surrounding the perpetration of the unlawful conduct," including "the defendant's presence during the commission of the offense, the defendant's continued close affiliation with other offenders after the commission of the crime, the defendant's failure to report the incident, and the defendant's flight from the scene." *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996). These factors "are not required for a finding of accountability and are instead used as considerations." *People v. Johnson*, 2014 IL App (1st) 122459-B, ¶ 152. However, "[e]vidence that the defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design, also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *Perez*, 189 Ill. 2d at 267.

¶ 44    Viewed in the light most favorable to the State, the trial evidence demonstrated that defendant entered the gas station store with fellow Ambrose gang members Miller, Cappelletti, and Conroyd, and stood in the doorway, flashing gang signs and shouting gang slogans. When Rahman parked at the gas station, defendant and Miller left the store and approached his

vehicle, shouting the name of their gang alongside the front passenger side door. Defendant stood a few feet from the vehicle while Miller pulled the door completely open and kicked Abdallah in the face or chest. When Abdallah exited the vehicle, defendant punched him on the right side of the head. Then, defendant punched Rahman, who was fighting with Cappelletti, and challenged Dajani and Rahman to fight "two on two." After Abdallah jumped on the van and collapsed, Miller returned to the fight and struck Rahman on the head with two glass bottles. Defendant then drove Miller, Cappelletti, and Conroyd away from the gas station.

¶ 45    Before turning to the question of defendant's accountability for vehicular invasion and first degree murder, we consider whether the evidence was sufficient to prove that a vehicular invasion and homicide occurred. Here, the surveillance video, along with Dajani and Rezzardi's testimony, was sufficient to establish that Miller committed vehicular invasion by kicking Abdallah while he sat in the car. 720 ILCS 5/12-11.1(a) (West 2010); *People v. Isunza*, 396 Ill. App. 3d 127, 131 (2009) (defendant committed vehicular invasion by reaching into the vehicle's open window and punching the victim's head). Additionally, the surveillance video and testimony from Dajani, Rahman, Dr. Kalelkar, and Dr. Kaufman all supported the finding that the codefendants committed homicide by "set[ting] in motion a chain of events" culminating in Abdallah's death. *People v. Brackett*, 117 Ill. 2d 170, 179 (1987). Dr. Kalelkar explained how Abdallah's external injuries would have caused enough stress to force his enlarged heart "out of rhythm," but that his death could also have resulted from witnessing "his friends being beat" and his conduct of running and jumping over the hood of the van, even if nobody actually struck him. Similarly, Dr. Kaufman testified that Abdallah's heart entered an "abnormal fatal rhythm" due to an "accumulation" of adrenaline from the entire altercation at the gas station. *Id.* at 178 (as long as the defendant's acts contributed to the death of the victim, sufficient proof of causation exists despite any preexisting health condition of the victim). Both Dr. Kalelkar and Dr. Kaufman found that the cause of Abdallah's death was homicide, and the evidence, taken together, supports the determination that the codefendants were responsible.

¶ 46    Turning to the factors establishing defendant's accountability, the trial evidence demonstrated that he was with members of his gang before, during, and after the vehicular invasion and homicide. See *People v. Malcolm*, 2015 IL App (1st) 133406, ¶ 51 (in determining accountability, "it is important to consider the defendant's knowledge of his companions at the time of the incident"); see also *W.C.*, 167 Ill. 2d at 338 ("the fact that the criminal acts were not committed pursuant to a preconceived plan is not a defense if the evidence indicates involvement on the part of the accused in the spontaneous acts of the group"). Defendant approached Rahman's vehicle with Miller, shouted gang slogans, and stood nearby while Miller kicked Abdallah. Additionally, defendant participated in the altercation by punching Abdallah and Rahman, drove the other offenders from the scene, and did not report the crimes. See *Batchelor*, 171 Ill. 2d at 376; *cf. Johnson*, 2013 IL App (1st) 122459-B, ¶ 133 (finding no accountability where the defendant "did nothing to assist *** the crime"). Consequently, defendant's involvement in the altercation and his affiliation with the other offenders established his accountability for both the vehicular invasion and the actions leading to Abdallah's death.

¶ 47    Defendant contends, however, that his murder conviction should be reduced to involuntary manslaughter because the evidence established that he lacked the intent to commit intentional or knowing murder, but rather, was "reckless in that he consciously disregarded a risk that

stress could cause Abdallah's heart to fail." Defendant submits that only a brief physical altercation occurred, he was not armed with a weapon, and neither the surveillance video nor Dajani's testimony established that he actually struck Abdallah. Additionally, defendant maintains that Dr. Kalelkar determined that Abdallah's external injuries did not cause his death, but rather, found that he died only after "running and jumping" over the van.

¶ 48    The State, in response, contends that defendant's accountability for Miller's conduct during the altercation, in addition to his own conduct in punching Abdallah, establishes that he committed intentional or knowing murder. The State maintains that Dr. Kalelkar's findings confirmed that Abdallah died due to the altercation that defendant instigated, encouraged, and participated in. Alternatively, the State argues that even if defendant's convictions for intentional and knowing first degree murder are reduced to involuntary manslaughter, his felony murder conviction remains valid because the evidence established that he was accountable for Miller's predicate felony of vehicular invasion.

¶ 49    In reply, defendant maintains that the State's brief mischaracterizes evidence from the surveillance video and Dajani's testimony regarding the punch to Abdallah's head and posits that none of the offenders acted with the intent to commit first degree murder. Defendant also claims that Abdallah's death was not a "foreseeable consequence" of any injuries he incurred during the altercation and, therefore, does not support a conviction for felony murder.

¶ 50    Initially, we observe that defendant was charged with one count of intentional murder (720 ILCS 5/9-1(a)(1) (West Supp. 2009)), one count of knowing murder (720 ILCS 5/9-1(a)(2) (West Supp. 2009)), and one count of felony murder (720 ILCS 5/9-1(a)(3) (West Supp. 2009)). The record indicates that the trial court provided the jury with a general verdict form and the jury convicted defendant of first degree murder. When a defendant is charged with murder under multiple theories, and the jury returns a general verdict of guilty of first degree murder, "the defendant is guilty as charged in each count and there is a presumption that the jury found that the defendant committed the most serious of the crimes alleged, which is intentional murder." *People v. Davis*, 233 Ill. 2d 244, 263 (2009).

¶ 51    "The key difference between first degree murder and involuntary manslaughter is the mental state ***." *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 42. A defendant commits first degree murder when he or she intends to cause death or great bodily harm or knows of a great probability of death or great bodily harm (720 ILCS 5/9-1(a)(1)-(2) (West Supp. 2009)), but commits involuntary manslaughter when he or she "recklessly performs an act that is likely to cause death or great bodily harm to another person." *Kibayasi*, 2013 IL App (1st) 112291, ¶ 42 (citing 720 ILCS 5/9-3(a) (West 2008)). Whether a defendant acted knowingly or intentionally "may be inferred from the circumstances surrounding the incident, defendant's conduct, and the nature and severity of the victim's injuries." *Id.* Moreover, "[w]hile a 'defendant may act recklessly where he [or she] commits deliberate acts but disregards the risks' of those acts [citation], '[a] voluntary and willful act having the natural tendency to cause death or great bodily harm is evidence of an intentional act rather than recklessness' [citation]." *Id.*

¶ 52    Here, the evidence was sufficient to establish that defendant caused or was accountable for the first degree murder of Abdallah. Here, a rational jury could infer from the eyewitness testimony, medical testimony, and video evidence that defendant and Miller intended to kill or cause great bodily harm to Abdallah or knew that their conduct would create the strong possibility of death or great bodily harm, when Miller forced open the door of Rahman's

- 11 -

vehicle and kicked Abdallah in the face or chest and defendant squared his body to Abdallah and punched him in the head. Although defendant observes that "generally, \*\*\* death is not a reasonable or probable consequence of a blow with a bare fist" (*People v. Gresham*, 78 Ill. App. 3d 1003, 1007 (1979)), our supreme court has explained that "[a]n individual who kills another by punching and kicking can be convicted of first degree murder if he acts with the requisite mental state." *People v. DiVincenzo*, 183 Ill. 2d 239, 254 (1998). Importantly, "inferences as to [a] defendant's mental state are a matter particularly within the province of the jury." *Id.* at 253.

¶ 53 Unlike in *People v. Lengyel*, 2015 IL App (1st) 131022, and *People v. Jones*, 404 Ill. App. 3d 734 (2010), both relied on by defendant, in this case, defendant did not cause Abdallah's death in the course of one-on-one mutual combat. Moreover, unlike in *Jones*, this is not a situation where defendant could not have known that his conduct would have caused the victim's death. *Jones*, 404 Ill. App. 3d at 747 ("there is nothing in the record to suggest that defendant was aware of the various degrees of pressure that, when applied to certain parts of a person's body, will cause that person to asphyxiate"). To the contrary, the evidence demonstrated that defendant confronted Abdallah, Rahman, and Dajani with two other members of his gang, punched Abdallah in the head, and was accountable for Miller kicking him in the face or chest. Based on this evidence, a rational jury could infer that defendant, and the persons for whom he was accountable, had the requisite mental state to commit first degree murder. Consequently, the evidence was sufficient to establish defendant's conviction for intentional or knowing murder, and we need not consider the parties' arguments pertaining to felony murder.

¶ 54 Finally, the State requests that this court correct defendant's mittimus to accurately reflect the aggravated battery offense for which defendant was convicted. The record establishes that, at trial, the State proceeded under one count of aggravated battery, which alleged that defendant battered Rahman "on or about a public way." 720 ILCS 5/12-4(b)(8) (West Supp. 2009). However, defendant's mittimus indicates that judgment was entered on one count of aggravated battery predicated on "great bodily [harm]." 720 ILCS 5/12-4(a) (West Supp. 2009). Defendant has not addressed this issue in either his initial brief or his reply brief. However, where the defendant's mittimus "incorrectly reflects the jury's verdict," this court may "amend the order to conform to the judgment entered by the court." *People v. Pryor*, 372 Ill. App. 3d 422, 438 (2007). Remand is unnecessary, as we may directly order the clerk of the circuit court to correct the mittimus pursuant to our authority under Illinois Supreme Court Rule 615(b)(1). *People v. McGee*, 2015 IL App (1st) 130367, ¶ 82. Accordingly, we order the mittimus corrected to reflect defendant's conviction for aggravated battery on or about a public way.

¶ 55 For the foregoing reasons, we affirm defendant's convictions and correct the mittimus.

¶ 56 Affirmed as modified.