2022 IL App (1st) 210351-U

No. 1-21-0351

Order filed October 13, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 16141 |
| | ) | |
| JONATHAN THOMPSON, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence at trial was sufficient to prove defendant guilty beyond a reasonable doubt of second degree murder under the common design theory of accountability.

¶ 2    Following a bench trial, defendant Jonathan Thompson was convicted, under an accountability theory, of two counts of second degree murder (720 ILCS 5/9-2 (West 2014)) and sentenced to two consecutive terms of 10 years and 9 months in prison. On appeal, defendant argues that the State failed to prove his guilt either as a principal or under the shared intent or

common design theories of accountability, and that the State's occurrence witnesses were not credible. For the reasons that follow, we affirm.[1]

¶ 3 Defendant's convictions arose from the September 2, 2015, shooting deaths of Michael Gibbs and Robert Anderson in Chicago. Following arrest, defendant and Michael Laster were charged by indictment with eight counts of first degree murder. Prior to trial, defendant and Laster filed motions pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), seeking to introduce evidence of the victims' violent characters to support an argument that they were the initial aggressors and that defendant and Laster acted in self-defense. Following a hearing, the court granted the request as to one prior incident involving Gibbs and one prior incident involving Anderson.

¶ 4 Defendant proceeded to a bench trial, and Laster was tried at a simultaneous but severed jury trial.[2] The State proceeded on four counts of first degree murder. Counts I and III alleged, respectively, intentional and strong probability murder of Gibbs, and counts II and IV alleged intentional and strong probability murder of Anderson.

¶ 5 At trial, Korell Johnson testified that on the night of September 1, 2015, he saw defendant and Laster together near a liquor store.[3] Johnson had known defendant for a number of years, as they were from the same neighborhood and had a similar circle of friends. He had never seen Laster before and did not know his name.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Laster is not a party to this appeal.

[3] Johnson acknowledged that on February 14, 2019, he was arrested for first degree murder. After an investigation, he was released and "charges were rejected or there were no charges." At some point, the State's Attorney provided him with "some expenses" so that he could move out of the neighborhood. On cross-examination, he agreed that he received $2200 to relocate.

¶ 6    After leaving the liquor store, Johnson met Gibbs and Anderson and went to a club with them for about an hour. Johnson had two or three shots of alcohol. Between 1:30 and 2 a.m., the group left the club and Gibbs drove them to a parking lot at Winthrop Avenue and Argyle Street, where Johnson had left his vehicle. As they entered the lot, Johnson saw defendant, Laster, and defendant's girlfriend, "Coco," standing outside the gate at the lot's entrance. Gibbs parked and he, Johnson, and Anderson sat in his vehicle for 15 to 20 minutes.

¶ 7    When the group left the vehicle, Gibbs approached defendant just outside the parking lot's entrance and asked to speak with him "about a situation." Anderson stayed in the lot. Gibbs told Johnson to "walk off," so he moved about 25 feet away. However, he still had a clear, unobstructed view of Gibbs and defendant, and heard them talking. Laster and Coco walked across the street from the parking lot's entrance.

¶ 8    Defendant and Gibbs argued. Then, defendant swung at Gibbs and Gibbs swung back at defendant. The two kept swinging at each other and "it turned into a tussle." Johnson saw defendant reach "into his pants and pull out a gun," a chrome revolver, from his waistband. Johnson did not recall which hand defendant used. Gibbs grabbed defendant's wrist "and the shots started going off." Johnson stated that there were "a couple of shots at the beginning," and that they were fired "[b]y the car."

¶ 9    Anderson came up behind defendant, put him in a chokehold, and tried to take the firearm from him. Anderson, Gibbs, and defendant ended up "on the ground tussling," with "[s]hots going off everywhere." As Johnson ran toward the group, Laster crossed the street holding a dark-colored firearm, stood over Gibbs and Anderson, and shot Gibbs in the head. Johnson ducked and heard another shot, followed by "[m]aybe one or two" more shots. When Johnson reached the group, he

shook Gibbs, but "knew he wasn't alive." Defendant fled with Laster and Coco toward Argyle. Johnson then turned to Anderson, who was bleeding but alive. Johnson held him, told him not to move, and called 911.

¶ 10    Many people arrived at the scene after the shooting stopped. One man Johnson knew from the neighborhood, Jerome Allen, "came around the corner" from Argyle. When the police arrived, Johnson told them what happened. He then went to the hospital to check on Anderson but learned he had died.

¶ 11    Later that day, Johnson went to the police station and viewed two sets of photographs. He was unable to identify anyone in the first photo array. In the second array, he identified defendant as "[t]he shooter." Subsequently, Johnson viewed a lineup and identified Laster as the person who shot Gibbs.

¶ 12    On cross-examination, Johnson stated that when he, Gibbs, and Anderson were sitting in Gibbs's vehicle for 15 to 20 minutes, they were not talking, smoking, or drinking. As far as he knew, defendant and Gibbs were members of the same street gang. He did not know for sure whether the firearm that defendant pulled from his pants was a revolver or an automatic. When asked for clarification regarding when defendant fired the weapon, Johnson answered, "Two shots had went off before like when [Gibbs] grabbed [defendant's] arm for the gun, that's when [Gibbs] grabbed him and two shots went off." Johnson could not see where defendant's finger was on the firearm. When asked whether it was on the trigger, Johnson answered, "He had a grip. He is [*sic*] his hand on the gun."

¶ 13    Johnson stated that after the first two shots, he dove between vehicles. He heard five or six shots in the first round of shooting; the first two went in the air, but he did not see where the other

shots went. When he reached the group, defendant was lying on the ground between Gibbs and Anderson. Johnson acknowledged his grand jury testimony that when he started in Gibbs's and Anderson's direction, he thought Gibbs and Anderson had been shot, as Gibbs was in a fetal position and Anderson was rolling from side to side. Laster then crossed the street and shot Gibbs in the head. On further cross, Johnson stated that after Laster shot Gibbs, Johnson ducked behind a vehicle again, then heard a second round of multiple shots. Johnson agreed that the second set of shots sounded different than those fired by defendant.

¶ 14    On redirect, Johnson reiterated that before Laster approached with his firearm, Gibbs was on the ground in a fetal position and Anderson was rolling around. The State asked whether, at that point, Gibbs and Anderson had been shot. Johnson answered, "I knew [Anderson]. I knew after the shots had been fired, I couldn't tell who was shot at the moment."

¶ 15    Allen testified that Gibbs was his older cousin and "hero," and Anderson was "like a big brother" to him.[4] He knew Laster from the neighborhood and had once lived with defendant. On the night in question, Allen was walking near Winthrop and Argyle, "enjoying the breeze." About 2:15 a.m., he noticed a group that included Laster, defendant, and Coco standing at the entrance of the parking lot. Defendant and Laster were both wearing black hoodies and dark pants. Allen walked on and, 20 to 30 minutes later, while he was talking on the phone, he heard gunshots from the direction of the parking lot. He hung up, called his aunt, Kimberly McCullough, to "express some concerns," and then "went straight to the gunshots."

---

[4] Allen acknowledged that he had been convicted of possession of a controlled substance with intent to deliver in 2016 and robbery in 2015.

¶ 16    As Allen approached the area, he saw defendant, Laster, and Coco running from the parking lot toward Ainslie Street and Winthrop. Johnson was standing in the middle of the street, screaming. When Allen arrived at the lot, he saw Gibbs lying on the ground. Anderson was trying to stand and "half his face was like gone." Johnson was attending to Anderson. Allen ran to Gibbs and implored him to get up, but Gibbs was unresponsive.

¶ 17    After speaking with police officers who responded to the scene, Allen went to a friend's home to change clothes, as his were bloody. Then, he "went to go find" defendant and Laster at a nearby apartment where he had seen them on previous occasions. Allen walked through the alley and saw defendant, Laster, and Coco standing on the porch with other people. He called his aunt and relayed some information, after which police arrived at the location. Just before the police arrived, Coco and another woman walked to a taxi in front of the building. In court, Allen was shown photos of defendant and Laster taken after their arrest, and noted they were not wearing black hoodies. Defendant was wearing a white tank top and Laster was wearing a blue shirt.

¶ 18    On cross-examination, Allen agreed that he did not see a firearm in defendant's hand and did not see Gibbs or Anderson get shot.

¶ 19    Chicago police sergeant Patrick Barker testified that he responded to a call of shots fired. At the scene, he saw a man, Allen, standing in the middle of the street with his hands up, holding a phone. Another man, Johnson, was standing on the sidewalk. Two injured men, Gibbs and Anderson, were lying on the ground in the parkway adjacent to the entrance to the parking lot, with a "profuse amount of blood" on their faces. Barker checked Gibbs for signs of life but found no pulse. Barker testified that "shockingly," Anderson stood, moved a few feet closer to the curb, and then collapsed. Barker and other responding officers secured the scene.

¶ 20    Barker observed spent shell casings and a bullet fragment near the area where Gibbs and Anderson had been lying on the ground. Then, Barker received information from other officers about a nearby location where the offenders may have been located and where two men and two women had attempted to enter a taxi but were stopped by the police.

¶ 21    Chicago police officer Robert Kellinger testified that around 2:17 a.m., he and his partner responded to a report of shots fired near Argyle and Winthrop. At the scene, Kellinger saw Barker standing at the entrance to the parking lot. Gibbs and Anderson were on the ground, with "blood all over the place." Both men were unresponsive, but then Anderson "rose up with his head and started looking around, and he became very combative." Kellinger urged Anderson to let paramedics treat him and eventually assisted him into an ambulance.

¶ 22    Kellinger then spoke with Allen while Barker spoke with Johnson. About 20 to 25 minutes after Kellinger arrived at the scene, McCullough, whom Kellinger knew to be related to Gibbs and connected to Allen, arrived. McCullough received a phone call and then related some information to Kellinger, who issued an alert to other officers about that information. He then ran to a nearby address, where officers formed a perimeter around a multi-unit dwelling. Kellinger left the scene briefly and, when he returned, observed a taxi in front of the building and that defendant, Laster, Coco, and another woman had been placed in custody.

¶ 23    The parties stipulated that the medical examiner who performed Gibbs's autopsy would have testified that Gibbs had suffered four gunshot wounds: one to the top of the head, one to the chest, one to the back, and one to the abdomen. The medical examiner recovered a bullet and jacket from Gibbs's head, and a bullet and jacket from his chest. A toxicological analysis was positive

for ethanol. She determined that Gibbs died as a result of multiple gunshot wounds and the manner of death was homicide.

¶ 24    The same medical examiner also performed Anderson's autopsy and found that he sustained three gunshot wounds: one to the head, one to the left arm, and one to the right hand. The medical examiner recovered two bullet fragments from Anderson's head and one from his hand. A toxicological analysis was positive for ethanol and benzoylecgonine, the main metabolite of cocaine. She concluded that Anderson died as a result of multiple gunshot wounds and that the manner of death was homicide.

¶ 25    Gregory Brate, a forensic scientist specializing in firearms identification, testified that he analyzed bullet jackets and metal fragments recovered from the autopsies. The recovered bullet jackets were all .40-caliber. He was unable to determine whether they were all fired from the same firearm. The parties stipulated that Pamela Schaffrath, an expert in firearm identification, would have testified that she analyzed six fired .40-caliber cartridge cases recovered from the scene and determined they were all fired from the same firearm.

¶ 26    Chicago police detective John Lally testified that he showed two photo arrays to Johnson. Johnson was unable to identify anyone in the first array. He identified defendant in the second array as someone he saw firing a weapon.

¶ 27    Chicago police detective Hector Alvarez testified that he presented a lineup to Johnson. Johnson identified Laster as a shooter.

¶ 28    Chicago police detective Steve Desalvo testified that he administered gunshot residue tests to defendant's and Laster's hands while they were in custody. The parties stipulated that, if called, an expert in trace chemistry would have testified that she analyzed the gunshot residue tests. She

concluded that Laster discharged a firearm, contacted a gunshot residue-related item, or had his right hand in the environment of a discharged firearm. She concluded that defendant may not have discharged a firearm with either hand and, if he did, then the gunshot residue particles were removed by activity, were not deposited, or were not detected.

¶ 29    The parties stipulated that Jennifer Wagenmaker, an expert in the field of forensic DNA analysis, would have testified that DNA extracted from a stain on the right leg of the jeans defendant was wearing at the time of his arrest matched Gibbs's DNA profile.

¶ 30    Chicago police detective Adrian Garcia testified that on September 4, 2015, he and other officers executed a search warrant of the apartment where Allen had seen defendant and Laster standing on the porch after the shooting. The officers did not recover any firearms, black hoodies, or other items of evidentiary value.

¶ 31    Defendant moved for a directed finding, arguing that there was no evidence Gibbs and Anderson were shot with two different firearms or that defendant "actually discharged a gun at all." The State responded that it had proceeded on theories of "armed with a firearm" and "accountability" and did not have to prove which bullet killed the victims. The State also asserted that Johnson had testified defendant shot a firearm several times. Defendant replied that he was not accountable for Laster's actions, as there was no evidence of "a meeting of the minds before or during" the shooting, or that he had asked for help or knew Laster had a firearm. The trial court denied the motion without discussion.

¶ 32    For defendant's case, the parties stipulated to the contents of the transcripts of testimony from the earlier *Lynch* hearing. In relevant part, at that hearing, Arthur Collins testified that in 2013, Anderson and three other men "snatched" him from his house and took $400 and a phone

from him, and that Anderson punched him during the incident. Chicago police sergeant Nicholas Cortesi testified that in 2004, Gibbs resisted arrest and reached for a firearm during the struggle.

¶ 33    In closing, the State argued, among other things, that defendant was guilty of first degree murder under a theory of accountability. The defense argued no evidence existed that defendant discharged a firearm and no evidence supported a finding of accountability.

¶ 34    The trial court initially found defendant guilty of all four counts of first degree murder, merging the two charges of strong probability murder into the two charges of intentional murder. The court further "considered whether there are mitigating factors present" and stated, "In my judgment there are. The finding will be to the second-degree murder. Judgment is entered on the second-degree murder."

¶ 35    Defendant filed a motion and a supplemental motion for a new trial, arguing, *inter alia*, that the State failed to prove him guilty beyond a reasonable doubt by failing to prove that he was accountable for Laster's actions. Following argument, the trial court denied the motion and supplemental motion without comment.

¶ 36    The trial court subsequently sentenced defendant to two consecutive terms of 10 years and 9 months in prison. Defendant filed a motion to reconsider sentence, which the trial court denied.

¶ 37    On appeal, defendant challenges the sufficiency of the evidence to convict him of murder, either as a principal or under a theory of accountability.

¶ 38    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their

testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). "Circumstantial evidence is sufficient to sustain a conviction, and the trier of fact 'is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.' " *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 40 (quoting *People v. Jackson*, 232 Ill. 2d 246, 281 (2009)). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 39 Defendant was charged with first degree murder. First degree murder occurs when an offender kills another individual without lawful justification and either (1) intends to kill or do great bodily harm to that individual or another or knows that such acts will cause death, (2) knows that such acts create a strong probability of death or great bodily harm to that individual or another, or (3) is attempting or committing a forcible felony other than second degree murder. 720 ILCS 5/9-1(a) (West 2014).

¶ 40 Second degree murder occurs when an individual commits first degree murder, but a mitigating factor is present. See *People v. Thompson*, 354 Ill. App. 3d 579, 585, 587 (2004); see also 720 ILCS 5/9-2 (West 2014). For a defendant to be guilty of second degree murder, the State must first prove him guilty of first degree murder beyond a reasonable doubt. 720 ILCS 5/9-2(c) (West 2014). Then, the defendant must prove by a preponderance of the evidence the presence of a statutory mitigating factor, including an unreasonable belief in self-defense or defense of another. 720 ILCS 9-2(a)(2), (c) (West 2014); see also 720 ILCS 5/7-1(a) (West 2014). If the defendant

meets this burden, then the State must disprove the mitigating factor beyond a reasonable doubt. 720 ILCS 5/9-2(c) (West 2014).

¶ 41    In this case, defendant was found guilty under a theory of accountability. A defendant may be held accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2014). A defendant's intent to promote or facilitate an offense may be proven by showing either that there was a common criminal design or that the defendant shared the criminal intent of the principal. *People v. Fernandez*, 2014 IL 115527, ¶ 21.

¶ 42    Relevant here is the common design theory of accountability. Under the common design rule, when a defendant aids another person in the planning or commission of an offense, he is legally accountable for the conduct of that person. *Id.* "Conduct" encompasses any criminal act that is done in furtherance of the planned and intended act. *Id.* "Words of agreement are not required to prove a common design or purpose between codefendants; a common design may be inferred from the circumstances surrounding the crime." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. Such circumstances may include the defendant's (1) presence at the scene without disapproval, (2) flight from the scene, (3) failure to report the crime, (4) close affiliation with the co-offender afterward, and (5) destroying or disposing of evidence. *People v. Gabriel*, 398 Ill. App. 3d 332, 345 (2010). None of these factors is required for a finding of accountability. See *Doolan*, 2016 IL App (1st) 141780, ¶ 43. Moreover, a defendant may be convicted by accountability of firearm offenses committed by someone he did not know was armed. See *Fernandez*, 2014 IL 115527, ¶ 19.

¶ 43    Defendant argues that the evidence was insufficient to convict him as a principal, as the evidence failed to demonstrate that he fired the shots that killed Gibbs and Anderson. He further argues that he cannot be held accountable for Laster's actions under either the shared intent or the common design theories of accountability. He asserts that no evidence showed that he gave Laster encouragement or aid, requested Laster's help before or during his struggle with Gibbs and Anderson, or knew Laster was armed and intended to join the struggle. He maintains that the fact he and Laster were at the scene together is not probative of criminal accountability, and that his leaving the scene with Laster immediately after the shooting "made sense" because Johnson was screaming and defendant and Laster could not have known if he was "calling on other gang members."

¶ 44    We conclude that there was sufficient evidence for a rational trier of fact to have found defendant legally accountable for Gibbs's and Anderson's murders beyond a reasonable doubt. Johnson testified that defendant and Laster had been together near a store earlier on the night in question, and both Johnson and Allen saw defendant and Laster standing together at the entrance to the parking lot. Johnson testified that Gibbs approached defendant on foot and the two men argued while Laster stood across the street. Defendant swung at Gibbs and, during the ensuing "tussle," pulled a firearm from his pants. Gibbs grabbed defendant's wrist, defendant fired two shots, Anderson intervened, and all three men fell to the ground with "[s]hots going off everywhere." Johnson thought Gibbs and Anderson had been shot, as Gibbs was in a fetal position and Anderson was rolling around on the ground. Laster then approached, shot Gibbs in the head, and fired several more shots.

¶ 45    Johnson and Allen both saw defendant and Laster flee the scene together. Shortly thereafter, Allen saw them together on the porch of a nearby apartment, in different clothing than they had been wearing at the time of the shooting, and saw Coco and another woman approach a taxi in front of the apartment building. Kellinger then observed defendant, Laster, Coco, and another woman being arrested near the taxi.

¶ 46    Viewed in the light most favorable to the State, with all reasonable inferences resolved in favor of the prosecution (see *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)), this evidence reasonably indicated a common design between defendant and Laster. Defendant initiated a physical confrontation with Gibbs, produced a firearm, and fired multiple shots. He was present when Laster fired more shots, fled on foot with Laster, failed to report the shooting, continued to affiliate with Laster afterward, apparently disposed of his hoodie and firearm, and then was arrested alongside Laster near a taxi outside the apartment building to which they had initially fled. Given defendant's actions and the surrounding circumstances, it would be reasonable for a trier of fact to infer a common design or purpose between defendant and Laster. See *Gabriel*, 398 Ill. App. 3d at 345. We cannot say that the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). The evidence, viewed in the light most favorable to the prosecution, was sufficient to prove defendant guilty.

¶ 47    Defendant nevertheless contends that the testimony provided by Johnson and Allen is unworthy of belief "because it is replete with inconsistencies and fabricated scenarios and motivated by a desire to deflect blame away from them and conceal the fact that [the victims] were the initial aggressors in the events that led to their death." He argues that no reasonable person

could accept as true their trial testimony with respect to his own actions and intentions at the time of the shooting, and that his convictions should be reversed "on this ground alone."

¶ 48    Defendant details several portions of Johnson's and Allen's versions of events that he asserts are incredible or peculiar, including, for example, that Johnson, Gibbs, and Anderson sat silently in a vehicle for 15 to 20 minutes; that Johnson did not know Laster from the neighborhood; that Gibbs grabbed the wrist of a person pointing a firearm at him; and that Allen was walking around the neighborhood simply to enjoy the breeze and stopped "only a block or so from the parking lot." Defendant suggests that the "facts are consistent with a planned group confrontation with [him], coordinated among fellow gang members, to eliminate or at least isolate [him] from the gang." He proposes that this plan failed because of the "unanticipated aggression" of Laster, and that "[a]t that point, the only way to salvage the plan was to ensure that all blame would be foisted upon [him], and that the police and the courts would remove Mr. Laster from the neighborhood indefinitely."

¶ 49    Defendant's arguments involve matters of credibility that are for the trial court to resolve in its role as trier of fact. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). It is the task of the trier of fact to determine when a witness testified truthfully and to decide how flaws in any part of the testimony affect the credibility of the whole. *People v. Gray*, 2017 IL 120958, ¶ 47. The trier of fact may accept or reject "as much or as little" of a witness's testimony as it likes. *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 46. As noted, the trier of fact assesses the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence, and resolves conflicts or inconsistencies in the evidence. *Id.*; *Brooks*, 187 Ill. 2d at 131. This court will not substitute its judgment for that of the trier of fact on these matters and we will not reverse a

conviction simply because a defendant claims that a witness was not credible. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009); *Brooks*, 187 Ill. 2d at 131.

¶ 50    Here, the alleged flaws that defendant has identified in Johnson's and Allen's testimonies relate to collateral matters and, therefore, do not automatically render their testimonies as to material questions incredible or improbable. See *People v. Gray*, 2017 IL 120958, ¶ 47. The trial court saw and heard Johnson and Allen testify. As such, it was in a much better position than this court to determine their credibility. *Siguenza-Brito*, 235 Ill. 2d at 229. Given its guilty judgment, the trial court apparently found Johnson and Allen to be credible as to material questions. The record does not establish that the flaws alleged by defendant rendered the whole of their testimonies unworthy of belief. See *Gray*, 2017 IL 120958, ¶ 47. Accordingly, we will not substitute our judgment for that of the trial court on this question of credibility. *Brooks*, 187 Ill. 2d at 131.

¶ 51    Moreover, we reject defendant's invitation to speculate as to a different version of events where he was the victim of a plot designed by Gibbs, Anderson, Johnson, and Allen. In reaching its decision, the trier of fact was "not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Hall*, 194 Ill. 2d 305, 332 (2000). In turn, this court will not search out possible theories of acquittal and prefer them over the findings of the trial court. *People v. Lee*, 2015 IL App (1st) 132059, ¶ 63. Viewing the evidence in the light most favorable to the prosecution, which we must, we find that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. The evidence is not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to defendant's guilt. *Slim*, 127 Ill. 2d at 307.

¶ 52    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 53    Affirmed.